[Civ. No. 2858. Fourth Dist. July 27, 1942.]

A. E. HODGEMAN, Appellant, v. THE CITY OF SAN DIEGO (a Municipal Corporation) et al., Respondents.

Charles B. Provence and William J. Adams for Appellant.

Jacob Weinberger, City Attorney, Morey S. Levenson and William H. Macomber, Deputies City Attorney, for Respondents.

MARKS, J.—This is an appeal from a judgment refusing to enjoin the execution of contracts between the City of San Diego and the Duncan Meter Corporation and the Karpark Corporation for the installation of parking meters in the city

of San Diego, or, if the contracts had been executed, to enjoin their performance.

The Duncan Meter Corporation is the manufacturer of the Miller Multiple Coin parking meter which is manually operated. The Karpark Corporation is the manufacturer of the Karpark parking meter which is a multiple coin automatic meter. Both companies also manufacture single coin meters. The individual defendants are officers of the city of San Diego.

Plaintiff is a resident and taxpayer of the city of San Diego and the local agent of the Dual Parking Meter Company, the manufacturer of the Dual parking meter which is a multiple coin automatic meter. It also makes a single coin meter.

In 1940, the Board of Harbor Commissioners of San Diego had eighty parking meters of different makes installed along the harbor front. In 1941, the city council decided to install parking meters on some of the downtown streets.

Section 94 of the city charter provides in part as follows:

"CONTRACTS. In the construction, reconstruction, or repair of public buildings, streets, utilities and other public works, and in furnishing any supplies, materials, equipment or contractual services for the same, or for other use by the City, when the expenditure therefor shall exceed the sum of one thousand dollars, the same shall be done by written contract, except as otherwise provided in this Charter, and the Council on the recommendation of the Manager or the head of the Department in charge, if not under the Manager's Jurisdiction, shall let the same to the lowest responsible and reliable bidder, not less than ten days after advertising for six consecutive days in a newspaper of a general circulation in the City for sealed proposals for the work contemplated. . . . All contracts entered into in violation of this Section shall be void and shall not be enforceable against said City; . . ."

Specifications for bidders were prepared and a notice of the time and place of receiving bids was published. The specifications were most general in form and designedly so to permit all manufacturers of various types of parking meters to submit bids. The original specifications described only single coin meters. An addendum was prepared calling for bids on multiple coin meters, that is, those operated by both pennies and nickels. This addendum was submitted to all bidders.

Bids were requested on not less than one thousand meters and were to be on the basis of what was in effect an option to purchase rather than an immediate purchase. The meters

were to be installed and operated over a period of six months with the right in the city to cancel the contract and require the removal of all meters within a specified time thereafter. The meters were to be paid for out of the revenue derived from their operation rather than from the general revenues of the city. Multiple coin meters were finally selected and installed so we need give no further attention to bids submitted for single coin meters.

Each bidder submitted a sample parking meter which, while not installed on the street, was inspected and operated by city officers. The operation of two makes was found to be unsatisfactory and they were not considered. One of these meters was supposed to be an infringement on the patent of another manufacturer. No point is made of the rejection of the bids to furnish the two unsatisfactory meters.

A committee was selected to investigate and report on the operation of the meters. A majority of this committee recommended the installation of the Dual Automatic Parking Meter. The city manager also recommended the installation of that meter.

The members of the city council made further investigation themselves both by inspection and operation of the meters and by consulting others whom they believed qualified to advise them on the problem of the best and most durable meter.

One councilman testified that a man in whom he had confidence as an expert on the mechanism of clocks (all the parking meters were operated with such a mechanical device) after investigation advised him as follows: ''And he particularly called my attention to the fact that the Dual, the gears in the Dual clock works were simply stamped out of think brass, and he said he felt the Dual meter—I believe I am reporting his statement to me correctly—he said that the Dual meter, in his opinion, was a beautiful looking meter and was designed to sell, rather than wear.''

The members of the city council were divided on the question of installing manual or automatic meters. After considerable discussion and investigation in which the city manager took part it was decided to divide the contract equally between the manual and the automatic meters. All the councilmen but one voted in favor of this decision. The city manager made no objection to it and concurred in the final awards made.

This decision left the Duncan Meter Corporation, manufacturer of the Miller Multiple Coin parking meter, as the sole bidder offering a manually operated meter after the elimination of the two unsatisfactory meters. It left the meter of the Dual Parking Meter Corporation, represented by plaintiff, and the product of the Karpark Corporation as contestants for the award of the contract for automatic meters.

Contracts were entered into for 500 Miller Multiple Coin parking meters at $61 each, plus 25 free meters with an installation charge on the free meters of $2.50 each; and 500 Karpark meters at $54, plus 25 free meters with an installation charge on the free meters of $2.00 each. Each contract provided for free servicing of the meters for six months and for furnishing supplies and other services without charge.

The Dual Parking Meter Company offered to supply 1,000 parking meters at $53.50 each, with no free meters, but with a servicing charge of $3.00 per year per meter.

Plaintiff maintains that the bid of the Dual Parking Meter Company was the lowest and that it was the "lowest responsible and reliable bidder"; that under the provisions of the charter the Council of San Diego was required to award the contract to it; that the awards to the other corporations were illegal and void acts.

If we regard the price bid as the only measure of which company was "the lowest responsible and reliable bidder" this argument lacks convincing force. The price of $54 per meter which the Karpark Corporation was to receive included six months free servicing of the meters. The bid of the Dual Meter Corporation was $53.50 for each meter with a $3.00 charge for servicing for one year. If the charge for servicing each meter for six months would be one-half of that sum, it would make the comparable price of the Dual Parking Meter $55 each or $1.00 higher than the Karpark. Another element enters into the contract price of that meter. There were 25 free meters to be installed at $2.00 each. The average price of the 525 Karpark meters would be about $51.52 each with six months free servicing which is substantially less than the price bid for the Dual meter.

It is true that the cost of the Dual Parking meter was considerably less than that of the Miller meter. The two meters are not comparable as they operate on different principles, the one being automatic and the other being manually operated. The evidence failed to give the trial judge, and fails to

give us, any basis on which to compare the values of these two varieties of meters other than that both seemed to operate satisfactorily in the tests made.

The trial court found, and we think correctly so, that the parts to be furnished and the services to be rendered by the successful bidders, and by the Dual Parking Meter Company, varied so much that there was no sufficient basis furnished upon which to compare the bids.

If price alone, together with the value of the free parts and service, determined which company was "the lowest responsible and reliable bidder" we would have no trouble in concluding that plaintiff had failed to maintain the burden of proving that the bid of the Dual Parking Meter Company was the lowest. It was higher than the bid of the Karpark Corporation. The proper construction to be given to the phrase in question was thus set forth in *West* v. *Oakland,* 30 Cal. App. 556 [159 Pac. 202]:

"It is the contention of the appellant that these two sections of the city charter of Oakland are to be read and construed together, and that when so construed the term 'lowest responsible bidder' as used in the body of section 130 thereof, and which has reference specially to the construction and equipment of public buildings, is to be held to mean only that the lowest responsible bidder shall be the lowest bidder who has not been delinquent or unfaithful in any former contract with the city; and that otherwise, in every case of contracts awarded by competitive bidding, the council must either award the contract to the lowest bidder or must reject all bids.

"We are of the opinion, however, that this is altogether too narrow and binding a construction to place upon these provisions of the Oakland city charter. There are many occasions in the experiences of municipal government when the quality of the thing to be supplied in the course of the public service depends upon conditions which differentiate bidders, and require the exercise of a sound discretion on the part of city officials in determining whether the wares or device which each individual bidder offers in the form of his own exclusive design are such as will meet the particular requirements of the intended work. In order to cover such cases it is quite usual in the provisions of city charters to find such terms as 'lowest and best bidder,' or as 'lowest responsible bidder,' and the like; and these phrases have been given by

the courts a particular meaning, in which it must be presumed that they are used by the framers of city charters in the absence of other limiting clauses. The term 'lowest responsible bidder' has been held to mean the lowest bidder whose offer best responds in quality, fitness, and capacity to the particular requirements of the proposed work; and that where by the use of these terms the council has been invested with discretionary power as to which is the lowest responsible bidder, having regard to the quality and adaptability of the material or article to the particular requirements of its use, such discretion will not be interfered with by the courts in the absence of direct averments and proof of fraud. (2 Dillon on Municipal Corporations, 5th ed., sec. 811, p. 1223, and cases cited.) And even when in statutes and charters the term 'lowest bidder' only is employed, the courts have held that in determining whether a bid is the lowest among several others, there may be cases where the quality and ability of the thing offered—in other words, its adaptability to the purpose for which it is required—may be considered. (*Clapton* v. *Taylor*, 49 Mo. App. 117; *Cleveland Fire-Alarm Co.* v. *Metropolitan Fire Commrs.*, 55 Barb. (N. Y.) 288.) In fact, it is conceded by counsel for the appellant that if, under a fair and liberal construction of this charter the city council had discretion, in awarding the contract to the lowest responsible bidder, to consider the quality of the respective devices upon which the several bids were predicated, such discretion honestly exercised will not be interfered with. We think it evident that the city charter of Oakland is to be given such a construction . . ."

■ It seems to be true that as the city of San Diego invited bids for not less than 1,000 parking meters from each bidder and failed to specify that the award might be divided between two or more bidders, each receiving less than the total number, and since the awards were so divided between two rival bidders, the result was the same as though there had been no advertisement for bids.

The trial court found in effect: That it could not be found with any degree of mathematical certainty which bid of the three corporations was most favorable to the purchaser, or which bidder's guarantee clause was most favorable, that this *is a matter as to which no exact comparison is possible,* but one purely of individual opinion; that which corporation was the lowest responsible bidder "was and is a matter depending

in part upon an exercise of discretion confided to the City Council . . ."

"That it is not true that the construction and use of parking meters has been standardized to the degree that they are commodities which can be furnished by competitive bidding.

"That it is true that parking meters vary widely in kind, quality, appearance, and manner of operation; that it is true that the guarantee and service arrangements which parking meter companies are willing to enter into vary greatly in many respects wherein the purchaser's advantage is concerned; that it is true that it is impossible to designate in advance, definite specifications which do not operate to exclude equally responsible and reliable bidders whose meters do not, and cannot in the nature of things, conform to those specifications; that it is true that the best interests of the City of San Diego in obtaining the soundest and most economical meters, require that specifications be left so flexible, and the discretion of the Council of said City of San Diego so broad, that Section 94 of the Charter of said City does not and cannot have practical application, or any application at all."

The trial court's conclusion that the nature of parking meters was such that it was impossible to draw specifications to permit any competitive bidding, must of necessity be true, because each meter was covered by a patent, and specifications particularly and exactly describing one meter would necessarily exclude others. The trial court also concluded that there was a discretion in the city council to determine the type of meter, both in physical appearance and mechanical operation, best adapted to the needs of the city; that an attempt at competitive bidding would work an incongruity, would not affect the final result and would produce no advantage; that the city council exercised its discretion reasonably in selecting parking meters; that section 94 of the city charter did not apply to the purchase of such meters.

In *Los Angeles Dredging Co.* v. *Long Beach,* 210 Cal. 348 [291 Pac. 839, 71 A. L. R. 161], the Supreme Court said:

"The charter of the City of Long Beach lays down the general requirement that all contracts, except as otherwise provided in the charter or by general law, must be made by the city manager with the lowest responsible bidder. In the instant case, the contracts were made without the letting of bids. This fact renders them void unless they come within

some exception to the rule set forth above. There are two well-recognized exceptions which are, we think, applicable to this situation.

"The first exception is founded on the fact that sometimes it is undesirable or impossible to advertise for bids for particular work. In such cases the statutory requirement is deemed not to apply. In 2 Dillon on Municipal Corporations, 1199, section 802, the law is thus stated: 'It has been held that where competitive proposals work an incongruity and are unavailing as affecting the final result, or where they do not produce any advantage . . . or it is practically impossible to obtain what is required and observe such forms, a statute requiring competitive bidding does not apply.' Our courts have approved this doctrine. (*Los Angeles Gas & E. Corp.* v. *Los Angeles,* 188 Cal. 307 [205 Pac. 125] ; *Miller* v. *Boyle,* 43 Cal. App. 39 [184 Pac. 421].)"

The foregoing rule should be applied here. The evidence fails to show that parking meters have been developed to the point where there is any reasonable basis of comparison between those which operate satisfactorily. If the specifications had been drawn strictly there could have been no competitive bidding because but one meter could have been described and there could have been but one bidder under them. Under such circumstances advertising for bids was unnecessary. (*Contra Costa Water Co.* v. *Breed,* 139 Cal. 432 [73 Pac. 189] ; *Los Angeles G. & E. Corp* v. *Los Angeles,* 188 Cal. 307 [205 Pac. 125].) There being no chance of real competitive bidding, to require it would work an incongruity.

There is no showing of any fraud, connivance or unfairness in the transaction. There is no indication that the councilmen did not act in perfect good faith and that the interests of the city were not well served in the action taken. Further, it is probable that if all the meters installed under the contracts are not now paid for, they will be before the judgment in this case can become final.

██ It is perfectly clear that the execution of the contracts sought to be enjoined cannot be prohibited now. They were executed on July 10, 1941, and on August 26, 1941, respectively. An act already performed cannot be prevented by injunction. All of the meters have been installed. They are in plain view and we may take judicial notice of that fact. (*Varcoe* v. *Lee,* 180 Cal. 338 [181 Pac. 223].) Perhaps they have been, or soon will be, fully paid for out of revenue pro-

duced by them. When paid for title has or will be vested in the city. It would hardly seem reasonable to expect a court of equity to enjoin the performance of a contract that undoubtedly will be fully performed before the case can be retried, should the present judgment be reversed.

■ Plaintiff urges error in the ruling sustaining a demurrer to his third cause of action. Five days were given in which to amend. No amendment was attempted.

That cause of action was an unsuccessful attempt, by innuendo and legal conclusion, to hint at fraud and undue influence in awarding the two contracts. No single ultimate fact was alleged upon which fraud or unfair dealings could have been predicated.

Had there been any fraud in the matter of awarding the contracts, proper allegations should have appeared in the pleadings. Plaintiff was given time in which to amend if he knew of any such facts that could have been alleged. He failed to amend. There was no error in the order sustaining the demurrer and no inference of improper action on the part of any councilman may be drawn under these circumstances.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied September 24, 1942.