[Civ. No. 38673. First Dist., Div. One. Mar. 29, 1977.]

ALBERT E. MEAKIN, Plaintiff and Appellant, v.
STEVELAND, INC., et al., Defendants and Respondents.

COUNSEL

Harold L. Howard and·John B. Harman for Plaintiff and Appellant.

Jacobs, Sills & Coblentz, William F. McCabe and Charles R. Breyer for Defendants and Respondents.

## OPINION

LAZARUS, J.*—This taxpayer's suit challenges the sale by respondent City and County of San Francisco (hereinafter city) of a 25-foot by 155-foot strip of public land formerly known as Ecker Street in downtown San Francisco to the owners of the abutting property. Appellant earnestly contends that the transaction was illegal and void because it was said to be in violation of the bidding requirements of city's charter.

In his original action, filed pursuant to section 526a of the Code of Civil Procedure,[1] the taxpayer, appellant Albert E. Meaken, sought both damages and injunctive and other equitable relief. Before trial, however, respondents Steveland, Inc. and First Market Company (hereinafter developers) completed the construction of a 40-story office building on the adjoining property, using certain developmental rights arising from the acquisition of Ecker Street. Hence, if appellant should ultimately prevail, his only remedy now would be in the form of damages.

Ecker Street was a one-block street intersecting with Market Street from the south between First and Second Streets. It was situated in part of an area encompassed by what is known as the Lower Market Street Development Plan. This plan was adopted by city prior to 1969. Its purpose was to stimulate the economic expansion and beautification of the locality, stressing the need for open space, and to encourage use of the Bay Area Rapid Transit District system (BART).

In 1969 developers began assembling properties to be used as the location for their office building. When city's department of planning learned of developers' intentions, developers were summoned before the department for a discussion of proposed design guidelines for the building. At that meeting developers were presented with a "proposed design frame" prepared by city for developers' project. This called for the partial closing of Ecker Street to vehicular traffic.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

[1]This section states in pertinent part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a county, town, city or city and county of the state, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a citizen resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

At that time, Standard Oil of California had already completed construction of a high-rise building on lower Market Street. The oil company's building bordered on the westerly line of Ecker Street, while developers' property was on the east side. City's interest in the street was therefore encumbered by easements of access for the benefit of the adjacent owners. Hence, city could not close the street to vehicular traffic, nor could it be sold without either obtaining the consent of those who had a right to such an easement, or paying compensation to them. (See *People* v. *Ricciardi* (1943) 23 Cal.2d 390, 397-398 [144 P.2d 799].) In addition to access easements, the property was also restricted by subsurface easements. This was because a large sewer, water lines, telephone lines and Pacific Gas & Electric installations were located underneath.

At developers' request, city's planning commission recommended that city vacate Ecker Street and convey title to developers, subject to the following conditions:

1. That the street be kept open for through passage of pedestrians at all hours of the day and night, for, substantially, its entire present width, except for such periodic closings as may be legally necessary to maintain fee ownership. The street should also be kept open during the period of construction;

2. That there be no construction in the present street area other than surfacing, landscaping and a transit entrance;

3. That final plans for the surfacing and other features in the present street area be subject to approval by the Market Street Task Force;

4. That a subsurface easement be retained by city for sewers and other utilities;

5. That the vacation not be completed until a site permit application had been finally approved by the city planning commission.

In mid-1971 an agreement was entered into between developers and city. This was after Standard Oil had given prior consent to the vacation of the street and its sale to developers. The agreement incorporated the conditions recommended by the planning commission, and required developers to construct and maintain on the property a pedestrian plaza open to the public. Developers agreed to pay city $290,625 (50 percent of

city's appraisal value). In addition to the monetary benefit, city would also acquire a pedestrian thoroughfare and plaza to be maintained at private expense where Ecker Street was formerly located.

In exchange developers, as abutting landowners, obtained the benefit of certain land bonuses attributable to Ecker Street, allowing them to increase by 159,000 square feet the size of the building they were planning for their assembled site. Under the planning code, if developed as a single lot and not in conjunction with abutting property, the Ecker Street site would be entitled to a floor space of 54,250 square feet. Under the purchase plan, however, developers were permitted to transfer the development rights of Ecker Street, along with various design bonuses for open space, BART access, etc., to the square footage of the building they were planning for their previously assembled site. As a consequence they were able to increase the total floor space by 159,000 square feet.

City's appraisal of the unencumbered value of Ecker Street was based on comparable sales. Specifically, the appraiser, city's director of properties, averaged the price per square foot paid by developers for other sites assembled for the project, and arrived at a figure of $150 per square foot, or $581,250 for Ecker Street. Thereafter he evaluated the encumbered interest which city was able to sell to developers at 50 percent of the market value of the unrestricted and unencumbered fee interest, or $290,625. Appellant contends that this was actually not a true appraisal.

His challenge to the sale rests primarily upon two grounds: (1) the sale was void because city did not comply with the bidding requirements of sections 7.401 and 10.100 of the city charter; and (2) city failed to obtain at least 90 percent of the actual value of city's interest as required by section 7.401 of the charter.

At trial appellant attempted to present evidence to show a valuation of the property based upon the dollar value of the additional floor space that developers were able to add to their building because of their transaction with city. His underlying theory was that the sale was not so much a sale of land, as a sale of developmental rights. The trial court refused to allow evidence in support of this approach, however. Accordingly, when an expert witness testified on appellant's behalf that in his opinion, which was based on the above theory, Ecker Street had a dollar value of $1,100,000, this testimony was stricken from the record.

The court's ruling was predicated upon its view that the criteria used by this witness were improper because they included the element of developmental rights to developers "which gets into the area of special purposes and, therefore, is not a valid basis for a determination as to market value." Appellant thereafter made an offer of proof as follows:

1. The highest and best use of Ecker Street was the use in conjunction with abutting property;

2. That, under the conditions and restrictions on the use of Ecker Street, there was no conventional market value for the fee of Ecker Street without consideration of the development rights;

3. That, under the provisions of appropriate laws and city codes, an owner abutting Ecker Street between Market and Stevenson Streets who purchased fee rights to Ecker Street would obtain floor area and design bonus opportunities (allowance of increases in floor space under certain design conditions approved by the planning commission) which would permit the addition of at least 159,000 square feet of floor space to a development on the abutting property owned by the purchasers of the fee;

4. When developers, as abutting owners, did, in fact, purchase the fee in Ecker Street, such acquisition did, in fact, allow them to add to their building on the adjoining property floor area in excess of 159,000 square feet. In standard appraisal practice, the method of determining site cost per unit of floor space is to divide total site cost by allowable square feet of floor space;

5. In the case of the abutting purchasers of the fee in Ecker Street, developers, the average cost of floor space per square foot was $6.89, based upon site cost per square foot of allowable floor space, excluding Ecker Street and excluding demolition costs;

6. The value of Ecker Street, based upon the value of floor area and design bonus opportunities, taking into consideration the conditions and restrictions on surface, subsurface and aerial use, was in excess of $1,099,030.

The court thereafter granted developers' motion for a "nonsuit"[2] on grounds that the uncontroverted evidence was that: (1) the purchase price was at least equal to 90 percent of the appraisal value of the property; and (2) there was substantial compliance with the requirements of sections 7.401 and 10.100 of the city charter.

1. ■ Was the transaction void because city admittedly failed to advertise for competitive bids in accordance with charter requirements?

Appellant's first contention on appeal is that the sale of Ecker Street to developers is void because city failed to publish invitations to the public to bid on the property. Section 7.401 of the city charter mandates that the director of property shall advertise a proposed sale of public property following his preliminary appraisal.[3] Section 10.100 defines "advertisement," as the publication of notices inviting bids in the official city newspaper for three consecutive days.[4]

City has stipulated that there was no attempt to comply with these directives in the present case. The court nevertheless found that because city had given notice of its intention to abandon Ecker Street, and also

[2]Technically, since the 1961 amendment to section 581c of the Code of Civil Procedure, motions for "nonsuit" are no longer applicable to court trials. The Legislature, however, in lieu thereof, created the new "motion for judgment" in court trials by adding contemporaneously section 631.8 to the Code of Civil Procedure. The instant motion and order will therefore be so regarded here.

[3]Among other provisions, section 7.401 specifies: "*Any real property owned by the city and county*, excepting lands for parks and squares, may be sold on the recommendation of the officer, board or commission in charge of the department responsible for the administration of such property. When the board of supervisors, by ordinance, may authorize such sale and determine that the public interest or necessity demands, or will not be inconvenienced by such sale, the director of property shall make a preliminary appraisal of the value of such property. The director of property *shall advertise by publication the time and place of such proposed sale.* He shall forthwith report to the department head concerned and to the supervisors the amount of any and all tenders received by him. The supervisors may authorize the acceptance of the highest and best tender, or they may, by ordinance, direct that such property be sold at public auction, date of which shall be fixed in the ordinance. No sale other than a sale at public auction shall be authorized by the supervisors unless the sum offered shall be at least ninety percent of the preliminary appraisal of such property hereinbefore referred to." (Italics added.)

[4]Section 10.100 provides in relevant part: "Whenever advertising or publication is required by the provisions of this charter, it shall mean one publication in each edition of the official newspaper of the city and county . . . unless a greater number of publications is specifically required; *provided that notices inviting bids shall be published for at least three consecutive days*, . . ." (Italics added.)

notice of vacation and sale to developers, there was a substantial compliance with the foregoing requirements.

■ Section 7.401 of the city charter, by its terms, clearly imposes a mandatory duty upon the director of property to solicit bids from the general public for sale of municipal property. As a general rule, contracts made in violation of the charter are void. (*Miller* v. *McKinnon* (1942) 20 Cal.2d 83, 87-88 [124 P.2d 34, 140 A.L.R. 570]; *City of Pasadena* v. *Estrin* (1931) 212 Cal. 231, 235 [298 P. 14].) And appellant is undoubtedly correct in stating that none of the cases cited by respondents talk about "substantial compliance" with a bidding statute.

But there may be exceptional circumstances under which compliance with competitive bidding requirements may be *excused.* It is now well established that where requests for competitive proposals would be futile, unavailing or would not produce an advantage, statutes requiring competitive bidding do not apply. (*Los Angeles Dredging Co.* v. *Long Beach* (1930) 210 Cal. 348, 354 [291 P. 839, 71 A.L.R. 161]; *Los Angeles G. & E. Corp.* v. *Los Angeles* (1922) 188 Cal. 307, 319 [205 P. 125]; *County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863, 878 [99 Cal.Rptr. 710]; *Hodgeman* v. *City of San Diego* (1942) 53 Cal.App.2d 610, 617-618 [128 P.2d 412].)[5] ■ It cannot be gainsaid here that this is such a case. Developers were the only potential purchasers for the interest in Ecker Street which the city had for sale. The subsurface easements alone precluded any construction on the property other than a pedestrian plaza. These easements, and the access easements belonging to developers and Standard Oil, rendered the property unmarketable, except to developers, Standard Oil having consented to its sale to developers. Additionally, developers were apparently willing to pay the *full* appraised value of the property. Under these circumstances, advertising for bids would not only be unnecessary under the foregoing exception to the rule, but also an idle act.

2. ■ Was there evidence to support the trial judge's finding that Ecker Street was sold by city for a sum which was "at least equal to 90 percent of the preliminary appraisal of the value of the property" as prescribed by section 7.401 of the charter?

[5]Appellant attempts to distinguish *Hodgeman* on grounds that in that case the city advertised for and accepted bids for the purchase of parking meters. While this is so, the reviewing court held that under the circumstances of the case, "the result was the same as though there had been no advertisement for bids." (53 Cal.App.2d 610 at p. 616.)

The attack on the judgment here centers around the last sentence of section 7.401 of the city charter, which reads: "No sale other than a sale at public auction shall be authorized by the supervisors unless the sum offered shall be at least ninety percent of the preliminary appraisal of such property hereinbefore referred to."

The trial judge obviously recognized that compliance with this requirement is indeed mandatory, stating, in granting defendants' motion for nonsuit: "I'm satisfied on the basis of the record here, plaintiffs having heretofore rested, that the evidence discloses that $290,625 is at least equal to 90 percent of the preliminary appraisal of the value of the property and, indeed, exceeds it."

Similar language was incorporated in the court's finding of fact number 2, and the conclusions of law that it ultimately reached[6] leave no doubt that the court properly recognized that compliance with this requirement was essential to the validity of the sale.

Here, we must agree with appellant that there was no evidence to support the foregoing finding and conclusions of law. As appellant correctly points out, $290,625 is 90 percent of $322,916.66, a sum that was never the subject of testimony or mentioned by anyone during the trial.

In fact, there was no true appraisal. What the director of property did was to take a simple average of the per square foot cost of other parcels assembled for the project, which resulted in the basic figure of $581,250 used for valuation purposes. He then arbitrarily cut this figure in half (because "it was the custom . . . this is the only reason I did it") and on that basis arrived at his recommended valuation of $290,625.

This method of appraisal was expressly condemned by the Supreme Court in *Harman* v. *City and County of San Francisco* (1972) 7 Cal.3d 150 [101 Cal.Rptr. 880, 496 P.2d 1248]. *Harman* was a pleading case in which the plaintiff taxpayer alleged in his complaint that this method of obtaining appraised values for purposes of sale of vacated city streets was illegal, the precise contention that is being made here. The plaintiff in *Harman* appealed from a judgment of dismissal entered after the trial

---

[6]The latter included the following: "(2) Section 9.401 of the Charter of the City and County of San Francisco, requires that CITY shall receive at least 90% of the market value of the property offered for sale. [¶] (3) The CITY having received at least 90% of the market value of the interest in Ecker Street which the CITY conveyed to defendants and cross-complainants there is no basis upon which to set aside the sale."

court had sustained a demurrer without leave to amend. Reversing, the Supreme Court held that the city charter requires the " 'preliminary appraisal' " of city-owned property offered for a noncompetitive sale to represent a "rational assessment" of the property's market value. As the court explained, "Otherwise, the director, by appraising the property at lower than market value, could sanction a sale of city assets at a price that subsidized the purchaser at public expense." (*Id.,* at p. 165.)

Ruling that "the arbitrary sale of the city's interest in its streets at the fixed fraction of one-half the fee value does not fulfill the charter requirement," the high court added: "If the city is to prove that plaintiff has not stated a valid cause of action it must show that *as a matter of law* its system of appraisal yields *in all instances* sale prices in conformity with charter requirements; in other words, that *as a matter of law* all easements of ingress and egress to streets have the *same value,* and that in all such cases that value approximates *50 percent* of the value of an unencumbered fee interest in that street. This proposition on its face cannot stand. An examination of established appraisal doctrine will illustrate its fallacy." (*Harman* v. *City and County of San Francisco, supra,* 7 Cal.3d 150 at pp. 166-167.)

Thus there was nothing before the court to support its finding of fact number 2. Indeed, the testimony of appellant's appraiser having been stricken, there is no competent evidence in the record on behalf of any of the parties as to the value of Ecker Street. We have no way of knowing whether the fair market value of the property is more or less than the $290,625 purchase price paid by developers. Indeed, appellant's main contention is that because of the restrictions on its use imposed by city it had little or no value other than the developmental rights that were acquired by developers. Hence, unless the court erred in applying the bar of the "special purpose" rule to exclude the evidence that would have been given by appellant's expert, appellant has failed in his burden to prove an important issue in this case, to wit: damages. (*Du Zeff's Hollywood, Inc.* v. *Wald* (1965) 235 Cal.App.2d 678 [45 Cal.Rptr. 584].)

3. ▮ Was the rule excluding evidence of value for a specific purpose erroneously applied to appellant's offer of proof?

We have now, therefore, reached the climactic question to be determined in this case. We have concluded that it was error for the trial judge to exclude appellant's profferred evidence as to value.

We start with the premise that because of its location and the restrictions applying to its use there was no conventional market value to Ecker Street unless consideration be given to the developmental rights attached thereto. It would therefore seem to follow that the highest and best use of the property, in fact the only use that might have pecuniary value to a prospective purchaser, would be in conjunction with abutting property. Hence, appellant argues, the transaction, although in form a sale of land, was in essence a sale of developmental rights. Because of the unique circumstances here involved he therefore contends that the only appropriate method of appraisal is to determine site cost per unit of floor space by dividing the total cost of the site by allowable square feet of floor space. Using this method appellant estimated that developers' cost of floor space per square foot was $6.89, excluding Ecker Street and excluding demolition costs. He therefore concluded that the value of Ecker Street, based upon the value of floor area and design bonus opportunities that it represented to developers, and taking into consideration the conditions and restrictions on surface, subsurface and aerial use, was in excess of $1,099,030 ($6.89 × 159,511 square feet additional building area).[7]

The trial court refused to permit this approach on the ground that it violates the rule followed in eminent domain cases against admission of evidence relating to a specific use in determining the just compensation to be paid for condemned property. His reasoning was as follows: "I'm satisfied applying the property rule as to market value that it would be proper to make inquiry as to the uses or purposes to which the dominant estate is adopted or for which it was capable, but without reference to specific use or purpose of the owner. [¶] For example, if that use extends to the construction of an office complex, how the vacated access would enhance the value of the dominant estate set as its use as a part of a servicing of the building or complex. But the Court cannot take evidence as to the number of square feet to be constructed on the dominant estate because that would violate the rule against specific use."[8]

---

[7] The floor area attributable to Ecker Street alone is 14 times the site area, or 54,250 square feet. The balance of 105,250 square feet is attributable to design bonuses under the city's Planning Code.

[8] The fact that other comments by the trial judge may have also indicated that he was apparently of the mistaken impression that this was a case involving the sale of a public street in which there was a termination of public easements due to the vacation does not affect the basic grounds for his ruling. However, appellant has correctly pointed out that under the terms of this transaction no public easements were terminated as to pedestrians, and that subsurface and aerial rights were retained by city.

Appellant contends that the trial court misapplied the specific purpose rule, urging that under the facts of this case, the court's ruling operated to deny appellant the right to present evidence as to the actual "market value" of Ecker Street, taking into consideration the highest and best use to which it could reasonably be adapted.

"Market value" has consistently been defined as "the highest price estimated in terms of money which the land would bring if exposed for sale in the open market, with reasonable time allowed in which to find a purchaser, buying with knowledge of *all* of the uses and purposes to which it was adapted and for which it was capable." (*Sacramento etc. R. R. Co.* v. *Heilbron* (1909) 156 Cal. 408, 409 [104 P. 979]; italics added; *Merced Irrigation Dist.* v. *Woolstenhulme* (1971) 4 Cal.3d 478, 488 [93 Cal.Rptr. 833, 483 P.2d 1]; *Harman* v. *City and County of San Francisco, supra,* 7 Cal.3d 150 at p. 165.) Where the highest and best use of separate parcels will involve their integrated use with the land of someone else, such prospective use may be properly considered in fixing the value of the property if a joinder of the parcels is reasonably practicable. (*People* v. *Ocean Shore Railroad* (1948) 32 Cal.2d 406, 424 [196 P.2d 570, 6 A.L.R.2d 1179]; *People* v. *Murray* (1959) 172 Cal.App.2d 219, 228-229 [342 P.2d 485]; *People* ex rel. *Dept. Pub. Wks.* v. *TeVelde* (1970) 13 Cal.App.3d 450, 455 [91 Cal.Rptr. 556]; *County of Santa Clara* v. *Ogata* (1966) 240 Cal.App.2d 262, 268 [49 Cal.Rptr. 397]; *Napa Union High School Dist.* v. *Lewis* (1958) 158 Cal.App.2d 69, 72-73 [322 P.2d 39].) Thus where the adaptability for a use depends upon the land being used in combination with lands belonging to other persons, such unitary use may be shown if the possibility of such combination is so great as to have a definite effect in enhancing the market value of the property.

In condemnation cases the courts have held however that the value *in terms of money* which the land would bring for a specific purpose or as a result of a project plan or development is not to be considered in determining market value. (*Sacramento etc. R. R. Co.* v. *Heilbron, supra,* 156 Cal. 408 at p. 412; *People* ex rel. *Dept. Pub. Wks.* v. *Silveira* (1965) 236 Cal.App.2d 604, 627 [46 Cal.Rptr. 260].)

This is because the test is not the value of the condemned land for a special purpose, but the fair market value of the land in view of *all* of the purposes to which it is naturally adapted. (*Sacramento etc. R. R. Co.* v. *Heilbron, supra,* 156 Cal. 408 at p. 412.) Hence an appraiser must ordinarily confine his opinion as to value to the subject property taken as a unit. But in calculating that value, he may include as an "increment of

value" the possible use of the subject property in conjunction with land belonging to another. The rationale of the eminent domain cases is that it is market value that is involved, and not the value to the owner or condemner.

But this is not a condemnation case. In fact it is more akin to any transaction negotiated between two private parties. Nor is there any real question here as to the highest and best use of Ecker Street. While, as heretofore mentioned, the transaction took the form of a vacation and sale of a fee interest in a public street, developers agreed not to construct on either the surface or subsurface of Ecker Street or to invade any aerial rights pertaining thereto. All that developers were really acquiring therefore were the developmental and design bonus rights that enabled them to add to the floor space of this building.

In fact, the "AGREEMENT FOR DISPOSITION OF LAND" entered into by and between city and developers specifically provided in paragraph 2(a)(2) that the transaction was conditioned upon the granting by city "of a site permit pursuant to Section 302.A.7[9] of the Building Code for construction of the project." It is not disputed here that the term "project" meant the proposed structure with the increased floor space included. The right to enlarge the building to include the additional 159,000 square feet was therefore made a condition precedent binding upon city before the sale could be consummated.

It must now be clear, therefore, that the developmental rights were obviously the only thing of value that city had to transfer to developers, and were the sole consideration for the transaction. In fact, appellant's

[9]The pertinent provisions of this section of the Building Code are as follows: "A site permit may be issued by the Central Permit Bureau for the construction of a structure upon approval of preliminary drawings and before the entire working drawings and specifications of the structure have been completed and submitted for approval, provided the total estimated cost of the structure exceeds $500,000. [¶] Such preliminary drawings and specifications shall clearly indicate the nature, character, extent and cost of the work proposed. Any person desiring a site permit shall file with the Central Permit Bureau an application therefor in writing, in accordance with the procedure as outlined in Section 301.B. The permit fees and plan checking fees shall be as set forth in Sections 303.A through 303.B and shall be calculated on the basis of the total cost of the work. No construction work shall be done under the site permit until detailed plans are submitted and are approved. When the detailed plans and specifications are in accordance with the nature, character, extent and cost indicated by the preliminary plans and specifications, an additional permit will not be required. [¶] Detailed plans for construction may be divided and submitted in accordance with a schedule approved in writing by the Superintendent and in general conformance with the partial construction divisions permitted by Sec. 302.A.1."

expert witness endeavored to explain that in his professional opinion the only rights of value in the property were the developmental rights. Thus, by excluding this testimony, the ruling of the trial court effectively foreclosed appellant from presenting any evidence that might support an award of damages. "Implicit in the ownership of real property is the bundle of rights familiar to real estate appraisers and lawyers. These include the right to build, demolish, mine, use and enjoy, alter, lease, mortgage, and sell. *Development rights* transfer is a system designed to permit the shifting of such rights as are related to the development of real property from one property to another within a designated zone or zones, under suitable planning *controls*. The system permits the orderly reallocation of density in a manner that meets legitimate planning objectives without placing unreasonable burdens on either the property owner or the community." (Appraisal J., MAI (July 1975) *Economics of Developmental Rights,* p. 527.)

The provisions of city's charter were manifestly intended to make it reasonably certain that city property would not be sold for less than 90 percent of actual value. City was entitled to receive for the property what it was actually worth for the best use for which it was adaptable. And if the developmental rights that had to be approved *before* the sale could be binding on the purchaser were the only use having value that city had to transfer, appellant was certainly entitled to show the value of the property for the highest and only purpose for which it was adapted. (*City of Los Angeles* v. *Decker* (1977) 18 Cal.3d 860 [135 Cal.Rptr. 647, 558 P.2d 545].)

The stricken testimony and appellant's offer of proof would, if admitted, have been at least prima facie evidence of value. Such evidence would not be speculative, but a method of computing value based upon reasonable certainty. In the event of a retrial, however, city may well offer counterevidence to show that the developmental and bonus rights pertaining to Ecker Street were worth considerably less than the $1,099,030 figure arrived at by appellant's expert based on the average per square foot cost of commercial floor space for the land in the assemblage. Or perhaps it may be shown that the $290,625 that developers paid to city was not the only thing of pecuniary value that city received as consideration for the transfer. If, for example, it can be established that developers' commitment to maintain Ecker Street as a pedestrian mall has a value that may reasonably be reduced to monetary terms, such value may well be considered to be an offset to any damages recoverable in this action.

In any event, in view of the conclusions that we have reached the judgment is reversed and the cause remanded for a further trial solely on the issue of damages.

Molinari, P. J., and Sims, J., concurred.

Petitions for a rehearing were denied April 26, 1977, and the petition of respondents Steveland, Inc. and First Market Company for a hearing by the Supreme Court was denied May 26, 1977.