[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an appeal by the plaintiffs, Bernard J. Pisacich and Judith H. Pisacich (Pisachich) from an assessment of damages for property of the plaintiffs in Waterford taken in condemnation by the defendant Commissioner of Transportation (Commissioner) on June 2, 1989.[1] This was a full taking.
In their appeal the plaintiffs allege the following: that "the Commissioner publicized and made known his intent to condemn parcels of land including the plaintiffs' parcel prior to the filing of the Certificate of Taking, which had the effect of depressing the value and marketability of the plaintiffs' parcel. . ."; that the Commissioner was unreasonably slow in filing the maps required by 13a C.G.S. 57[2] and the filing of the Certificate of Taking as required by C.G.S. 13a-73" and "that the plaintiffs, as owners of the property taken, are aggrieved by such CT Page 3904 assessment of damages because the same are inadequate." In their prayer for relief the plaintiffs seek reassessment of the damages based upon their claimed inadequacy, additional damages because of the unreasonable delay between the filing of the maps required by statute and the filing of the certificate of taking in accordance with General Statutes 13a-76 and their costs.
The appeal was referred to the undersigned for hearing and judgment. The hearing was held at which the plaintiff Bernard Pisacich, the plaintiff's expert Christopher Miner and the defendant's expert Kay Molochko testified. The two experts had each prepared a written appraisal report which had been exchanged prior to the hearing. Thereafter, the court viewed the site on the subject property with both counsel.
The plaintiffs' property taken by the state comprised 0.126 of an acre, more or less, which extrapolates into 5.489 square feet. It consists entirely of unimproved land and is located or Austin Street in Waterford. Shortly past the subject property Austin Street deadends in Interstate 95 (I-95) which is the main highway through Waterford that carries traffic between New York and Providence and Boston. Electricity and telephone are the only utilities available to the subject property. This land of the plaintiffs, which is triangular in shape has a frontage of 90.5 feet, more or less, on Austin Street and an average depth of about 50 feet. Its northeasterly boundary is 124 feet, more or less, and it abuts two parcels, one owned now or formerly by one Okasha, Trustee and the other owned now or formerly by one Hagar. These latter parcels, like the subject are small in size, comprising .17 of an acre, more or less, and .11 of an acre, more or less, respectively. Both the Okasha and Hagar parcels, which are located in the IP-1 (General Industrial Park Zone)[3] had a single family residence on them which front on Connecticut Route #85, These two parcels are permitted residential use as they existed before zoning. Route #85 is the major route from New London to Hartford; it connects with Route #2 in Colchester. The Pisacich property which is located about 100 feet in from Route #85 lies about 800 feet south of a large shopping mall (Crystal Mall) along the east side of Route #85. Along the east side of Route #85 north of I-95 to a point opposite the Crystal Mall are stores, a dairy restaurant, nursery school, a dentist's office and vacant land. The subject property, situated as it is off the south side of Route #85 is also near the junction of Route #85 and I-95 to which (I-95) there are entrance and exit ramps on the northerly side of Route #85.
 I
We turn now to the matter of the damages assessed by the Commissioner for the full taking of June 2, 1989. The plaintiff CT Page 3905 Bernard Pisacich testified that he purchased the subject in 1982 for $5,000.00, that he did so for investment purposes and that he had spoken to Waterford Zoning authorities prior to purchasing it. He indicated that in 1982 he knew that the Crystal Mall was to be completed, and that he believed that the subject together with the Okasha and Hagar parcels presented significant commercial value and that the subject was key to any such assemblage. When the plaintiff purchased the subject he said that the tax value, as indicated by Waterford assessment, was also considered by him. In any event, he considered that the subject in and of itself was quite valuable. Moreover, his position concerning his view of the value of the subject, he testified, was supported by the circumstance that he was notified by the Waterford assessor that, because of a reassessment, the assessed value of this property, as of the assessment year beginning October 1, 1986, was increased to $19,360.00 based on the true and actual value of $27,657.00. Claiming that this too high, Bernard Pisachich, in accordance with a letter[4] from the assessor accompanying the notice of increase, did contact the assessor. As a result, he stated that the reassessment figure of $19,360.00 was reduced to $6,914.00. It was also his view that the subject was worth $50,000.00 on June 2, 1989. He considered it to be crucial in any assemblage with the Hagar or Okasha parcels or both for development purposes.
"Although there is authority to the contrary, the owner of the land is generally held to be qualified to express his opinion of the value merely by virtue of his ownership. He is deemed to have sufficient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use, to have a reasonably good idea of what it is worth," 5 Nichols, Eminent Domain (Rev.3d ed. 1989) 118.4 [2]. The District of Columbia Circuit Court of Appeals has said:
 "The owner does not testify as just another expert, but from his unique position as the individual who stands to gain or lose the most from the tribunal's determination of the value of his property. The owner is draped with no cloak of expertise; the jury is aware of the owner's interests and free to evaluate his testimony, even to discard it altogether, in weighing the evidence. . . ."
District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land in Squares 859, 912, 934 and 4068 in the District of Columbia, 534 F.2d 357, 340 (D.C. Cir. 1976). Furthermore, "It has been held that an owner is qualified to express an opinion only in a reasonable way." 5 Nichols, Op. Cit., 7.3[2] and cases there cited. A landowner must relate a satisfactory explanation on cross-examination to justify his value estimate, CT Page 3906 and that is to be considered on the weight of his testimony. Arkansas State Highway Commission v. Cash, 590 S.W.3d 676, 679
(Ark. 1979); City of Elko v. Zillich, 100 Nev. 366, 683 P.2d 5, 8
(1984); Carlson v. Town of Holden, 358 Mass. 22, 26-27,260 N.E.2d 666 (1970); Roote v. Kakadilis, 3 Conn. Cir. 283, 287 212 A.2d 898 (1965).
As he testified Mr. Pisacich placed stress upon the "tax value" as indicated by town tax assessments on the subject as he claimed such value impacted on fair market value. There was no evidence of any such "value" as to either the Hagar or Okasha parties.[5] Although there was such evidence in this case Nichols has said that "It is almost everywhere the law that the value placed on a parcel of land for the purposes of taxation by the assessors of the town in which it is situated is no evidence of its value for other non tax purposes. This rule of exclusion has been applied in the determination of value in eminent domain proceedings." 5 Nichols, Eminent Domain, 22.1; see Martin Adm'x. v. New York, New England Railroad Company, 62 Conn. 331, 343,25 A. 239 (1892): 39 A.L.2d 209, 214. One reason given for excluding it has been said to be that when offered as substantive evidence of market value it is hearsay and represent an exparte statement of the assessor not subject to cross-examination, e.g. Vine Street Corporation of City of Council Bluffs, 220 N.W.2d 860, 862 (Iowa 1974) and cases there cited. Other reasons for excluding it is that an assessment is really res inter alios acta and that they are unreliable as a criterion of their value, see e.g. State v. 45,261 Square Feet of Land, 475 P.2d 553, 554 (Ark. 1970), that they are valuations made for a special purpose and are not competent as original evidence of value for any purpose other than that for which they were made, State v. 45,261 Square Feet of Land, supra. With reference to this last observation the Fourth Circuit Court of Appeals, in United States v. Certain Parcels of Land in the County of Arlington, State of Virginia, 261 F.2d 287,291 (4th Cir. 1958) said in a condemnation case:
 "Aside from the general unreliability of tax assessments as an indication of market value, which ought to make them suspect in any case, the assessing officials are representatives of the public. The power of a tax official to bind the public is limited, and what he does for purposes of taxation, should not be binding upon the public, or prejudicial to the public interest, when other public officials are engaged in the performance of a very different public function in an unrelated field. Though the tax official may purport to use market value as the criterion of assessed value, his primary concern is with relative, not absolute, values, CT Page 3907 * * *."
See also Department of Public Works and Buildings v. Cohen, 9 Ill. App. 3
d. 85, 291 N.E.2d 883, 887 (1972) (a condemnation proceedings). The "tax value" or assessed value can, therefore, be given little weight.
We note in passing that there is no cognizable evidence of any offer to buy the subject, either alone, or in assemblage with other properties, particularly those of Hagar or Okasha. In any event, even if there were, most cases have held that an unaccepted offer to purchase is not admissible as evidence of its value. See 18 A.L.R. 4th 571, 578; Sharp v. United States, 191 U.S. 341,24 S.Ct. 114, 48 2. Ed, 211 (1903); See McDermott v. New Haven Redevelopment Agency, 184 Conn. 441, 449 440 A.2d 168 (1981). Furthermore, whatever evidence was adduced, as to a proposed use of the subject commercially as suggested by Bernard Pisacich was so remote and speculative that it cannot fairly have any legitimate effect upon fair market value. See e.g. Tandet v. Urban Redevelopment Commission, 179 Conn. 293, 300, 416 A.2d 180 (1979). Fair market value, when one considers the willing buyer-willing seller context, "must reflect economic realities and not be based on speculation or conjecture." See Olson v. United States, 292 U.S. 246, 254-255, 54 S.Ct. 704, 708-709, 78 L I 1236 (1954). The court respectfully cannot accept, on the law and credible evidence in this case, a claim that the subject property has the fair market value ascribed to it by the plaintiff Bernard Pisacich. Even the expert produced by the plaintiffs did not testify at all about any fair market value for the subject in excess of $8,000.00 nor was any such figure ever inquired of him by plaintiffs' counsel.
The court now takes up the evidence of the expert witnesses concerning fair market value of the plaintiffs' property taken by the state. Miner and Molochko both utilized the direct sales comparison approach to fair market value by comparing residential land sales of non-buildable lots to the subject. It was Miner's opinion that the highest and best use of the subject was one "in conjunction with an adjacent or nearby property." Molochko's opinion was that the highest and best use of the subject was in assemblage with an abutter. Miner's opinion was that the fair market value, as of the taking date of June 3, 1989, was $8,000.00. It should be pointed out the state had first assessed damages to be $500.00 in its "nominal" appraisal dated January 18, 1989. Later, on June 2, 1989, it made another appraisal of the damages it assessed the damages to be $1,150.00. There was no satisfactory explanation of the reason for this increase of damages by the state.
The state cannot take the plaintiff's property without CT Page 3908 paying it just compensation for the taking. See e.g. Gentile v. Ives, 159 Conn. 443, 447, A.2d (1970). "The question of what is fair compensation is an equitable rather than a strictly legal technical one. The paramount law intends that the condemnee shall be put in as good condition pecuniarily as he would have been had the property not been taken." Gentile v. Ives, supra 447-448 quoting from Colaluca v. Ives, 150 Conn. 521, 530 191 A.2d 340
(1963). Valuation is a question of fact "to be determined by the trier's independent judgment of what is just compensation. D'Addario v. Commissioner of Transportation, 180 Conn. 355, 369,429 A.2d 890 (1980). "The purpose of offering in evidence the opinions of experts is to aid the trier to arrive at his own conclusion, which is to be reached by weighing those opinions in the light of all the circumstances in evidence bearing upon value and his own general knowledge of the elements going to establish it. . . . Ultimately, the determination of the value of the land depend[s] on the considered judgment of the referee, taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties. . . ." Bennett v. New Haven Redevelopment Agency, 148 Conn. 513, 516, 172 A.2d 612 (1961); see Gentile v. Ives, 159 Conn. 443, 451, 270 A.2d 680 (1970).
The referee is the final judge of credibility of witnesses and the weight to be given their testimony. Morgan v. Hill,139 Conn. 157, 161 A.2d (1952). In this process the "trier's acceptance and use of the testimony on some points does not preclude its rejection on others." Morgan v. Hill, supra 162. The opinion of any expert is not binding on the court. Birnbaum v. Ives, 163 Conn. 12, 20, 30 A.2d 262 (1972). The visual observations made by the trier in a visit to the property is just as much evidence as evidence presented for his consideration under oath. Birnbaum v. Ives, supra.
In determining fair market value, see Gebrian v. Bristol Redevelopment Agency, 171 Conn. 565, 571 370 A.2d 1056 (1976); Connecticut Printers Inc. v. Redevelopment Agency, 159 Conn. 407,410, 170 A.2d 549 (1970); Mazzola v. Commissioner of Transportation, 175 Conn. 576, 581-582, A.2d (1978), both expert witnesses used the market data comparable sales approach to value.
As no two pieces of land are ever exactly alike, it must be remembered that the comparison is made with land which is similar to that taken and accordingly no general rule can be laid down regarding the degree of similarity. 5 Nichols Eminent Domain 21.3[1], 21.31; 27 Am.Jur.2d Eminent Domain 2429, p. 433 (2d ed 1966). The more comparable, however, the comparables advanced, the more probative they are of fair market value of the subject. United States v. 826.0 acres of land, 605 F.2d 762, 798 (5th Cir. 1979); 5 Nichols, Eminent Domain, 21.3[1]. While comparable sales is one of the most reliable methods of determining fair CT Page 3909 market value, see e.g. United States v. 2,500.00 acres of land,436 F.2d 498, 402 n. 2 (10th Cir. 1988); L'Etoile v. Director of Public Works, 89 r.I. 394, 153 A.2d 177 (1989); State ex rel Highway Commission v. Jasper, 544 S.W.2d 554 (1976), its most appropriate utility must consider all significant factors affecting comparability which include among others: location and character of the property, proximity in time and location, the use to which the property is put, size, adaptability, zoning and available utilities. See 5 Nichols Eminent Domain 21.3, 21.31; Campbell v. New Haven, 101 Conn. 173, 125 A. 650 (1924). It is for the fact finder to determine whether the claimed comparables are in fact comparable, and if found comparable, to determine the weight to be accorded thereto. United States v. 84.4 Acres of Land, Etc., 238 F.2d 117, 119 (3d Cir. 1965); United States v. 67.59 Acres, 447 F. Sup. 844, 846 (M.D.Pa. 1978); see E.B.F. Realty v. Department of 173 Conn. 247, 377 A.2d 302 (1977).
Miner employed as comparables four non-buildable lots in Waterford and one in East Lyme, all of which were non-buildable due to their size. He said that the comparables he chose were a "census" of properties he considered comparable. They were, as were the state's comparables, all located in residential zones. Molochko used as her comparables three properties in Montville which were all close to lake properties. They were also all non-buildable lots due to size and were located about five miles distant from the subject property. Moreover, all three are confined to the area of Lake Oxoboxo in Montville. Miner did indicate that the tax rate in Waterford is lower than that in surrounding towns due to the presence of the Millstone Nuclear Power Plant and that this lower tax rate is reflected in higher prices for property in Waterford as compared to surrounding towns. Generally speaking, Waterford lies easterly of New London and abuts northerly on Montville. Miner did not use Montville properties for his comparables as property values there are lower "in general" than in Waterford. This is so, he opined even though adjustment may be made for that factor. However, he said that one is at risk in so adjusting in the value context. Molochko, on the other hand, said she restricted her criteria in selecting comparables just to parcels where sales to abutters were involved and no sales in Waterford met her criteria. Significantly, all three of the comparables used by the state were sold to abutters whereas only two of the five advanced by the plaintiffs were sold to abutters. This does not avail the plaintiffs' claim of the highest and best use of the subject in their claim of assemblage. Moreover, all five comparables used by the plaintiffs have electricity, telephone and water available while all those of the state have only electricity available. On this aspect, the state's offered comparables which had just electricity and telephone available but no water. All five of the plaintiffs' comparables concededly enjoy locations[6] superior to that of the CT Page 3910 subject. Three of the plaintiffs' comparables have view amenities and the subject has none. Both sides made adjustments, inter alia, for size, location and shape. The court, after reviewing the reports and testimony of fair market value, while finding certain of it helpful, cannot conclude that the opinion of either appraiser is wholly persuasive.
In returning to the subject property itself, we note in addition to the principles already set out that
 "It is the court's duty to award just compensation to an owner whose property is taken for public use. The usual measure of just compensation is the fair market value or the price that would probably result from fair negotiations between a willing seller and a willing buyer, taking into account all the factors, including the highest and best or most advantageous use, weighing and evaluating the circumstances, the evidence, the opinions expressed by the witnesses and considering the use to which the premises have been devoted and which may have enhanced its value. (citations omitted)"
Wronowski v. Redevelopment Agency, 180 Conn. 579, 586,430 A.2d 1284 (1990).
The subject itself does not meet the minimum zoning requirements for the IP-1 General Industrial Park Zone in which it is located. For example, inter alia, it does not meet the minimum lot area requirement of 40,000 square feet having only 5,489 square feet, it does not meet the minimum frontage requirement of 200 feet having only about 90 feet frontage nor does it meet any of the minimum set back requirements. Any one of these impacts adversely on the marketability of the subject itself. There is no credible evidence of any use to which it has been put in the past. The highest and best use, according to both experts, is that of assemblage with other property. The plaintiff Bernard Pisacich and his expert spoke during their testimony in terms of assemblage with the Hagar or Okasha parcels or with both. We note that these parcels have frontage on Route #85 and permitted residential uses because each represented non-conforming uses. In terms of development nothing can be done to the subject in and of itself given the zoning deficiencies, and it cannot be used for residential, commercial or industrial purposes. There is no competent evidence supporting any reasonable probability of any zoning change even looking toward developing it.
It is evident, therefore, that the parties agree that the CT Page 3911 highest and best use is in the assemblage context. This was what Bernard Pisacich indicated as did his expert vis a vis the Hagar and Okasha parcels. Market value, of course, is not limited to value for the use to which the land is actually devoted, Nichols, Eminent Domain (Rev.3d ed. 1989) 1213.14, 1213.12, n. 1; Schwartz v. City of New London, 20 Conn. Sup. 21, 120 A.2d 84 (1955); Cain v. City of Topeka, 4 Kan. App. 2d 191, 603 P.2d 1031, 1032
(1980). If an owner whose land is taken contends that his land is not at the time being used at its highest potential, it is for him to establish that as a fact. Nichols has said that "In order to merit consideration the potential as users must be so reasonably probable to motivate a prospective purchaser in his desire to acquire the property. Purely imaginative or speculative values are excluded." 4 Nichols, Eminent Domain, 12.314(2), pp 12-389-390 (3d ed 1978); see Cain v. City of Topeka, supra 1032-1033; Clarmar Realty v. Redevelopment Agency, 383 N.W.2d 890, 893 Wis. (1966). An owner of real property is entitled to have the fair market value of his property determined by reference to its highest and best use, see Olson v. United States, 292 U.S. 246,255, 54 S.Ct. 104, 78 L.Ed. 1236 (1934); Tandet v. Urban Development Commission, 179 Conn. 293, 299, 426 A.2d 280 (1979). In Tandet the court said:
 "Where in the opinion of the appraiser the property is not, on the date of taking, being put to its highest and best use, it is incumbent upon the appraiser to provide the trier with sufficient evidence from which it could conclude that it is reasonably probable that the land to be taken would, but for the taking, be devoted to the proposed use by a prudent investor in the near future.
The uses to be considered must be so reasonably probable as to have an effect on the present market value of the land. Any plaintiff's proof, be it from an owner or appraiser, must recognize this. Courts which hold assemblage is a proper consideration in determining fair market value in condemnation matters do so only if the property owner shows that there is a reasonable probability that the claimed assemblage can be accomplished in the reasonably near future and the burden of proof on this matter is upon the owner. See United States v. Powelson,319 U.S. 266, 275-276, 63 S.Ct. 1047, 876 ed. 1390, Clarmar Realty v. Redevelopment Agency, supra; Cain v. City of Topeka, supra; State v. Long, 344 So.2d 754 (Ala. 1977); 4 Nichols, Eminent Domain, P. 12, 3142[2] (3d ed. 1978). Accordingly, just compensation cannot be based on potential uses that are speculative or conjectural. United States v. 320.0 Acres of Land,605 F.2d 762, 814 (5th Cir. 1979); United States v. 1,291.83 Acres of Land, 411 F.2d 1081, 1084 (6th Cir. 1969). CT Page 3912
The plaintiffs have not sustained their burden of proof on the factor of such assemblage so as to entitle it to consideration on the ultimate issue of fair market value. While it is not considered necessary that the plaintiffs own the Hagar or Okasha parcels or both, which they never did not, there is no credible evidence to demonstrate that they ever had a cognizable option to buy either or both or that they ever seriously negotiated to acquire either or that the owners of either of those parcels or both of them were even willing to sell to the plaintiffs. This does not avail the plaintiff in their apparent position that a doughnut chain was interested in an assemblage that might involve plaintiffs' property and the abutting properties of Hagar and Okasha. The plaintiffs have not sustained their burden of proof on the "assemblage" branch of their claim.
In addition, not only must such a potential assemblage be demonstrated to be reasonably probable as already noted but this would include the reasonable probability that the zoning of such assemblage be such so that its potential use as assembled can be reasonably practicable in a given case. See e.g. Cain v. Topeka, supra; Meakin v. Steveland, 68 Col. App.3d 470, 502,137 Cal.Rptr. 359 (1977). It would appear that the assemblage suggested could require a zone change in this case. "The probability of a favorable zone change is an element which might influence the price which a purchaser in a voluntary transaction would pay." Lynch v. West Hartford, 167 Conn. 67, 73-74, 355 A.2d 42 (1974). In Budney v. Ives, 156 Conn. 83, 239 A.2d 481 (1968) the Supreme Court held that where a zone change is reasonably probable as of the taking date, its probability may properly be considered in determining the fair market value of property taken by eminent domain. See Lynch v. West Hartford, supra 74. The existence of a reasonable probability of a zoning change is a question of fact for the trier. Lynch v. West Hartford, supra. There has been no such demonstration of that in this case.
On the law and the credible evidence, the court finds the plaintiffs aggrieved and concludes that the fair market value of the subject property as of the date of taking was $3,018.95. The state has already paid into court $1,150.00 and the plaintiffs have moved for and been paid that amount. Therefore, the balance due the plaintiffs Pisacich in damages for the taking of June 2, 1989 is $1,868.95 plus interest thereon due them from the taking date of June 2, 1989.
 III
The plaintiffs also claim that their appraisal expert Miner is entitled to $2,500.00 in fees. That amount is claimed by them "as reimbursement for total appraisal fees including court time in CT Page 3913 the amount of $2,500.00." Miner testified that his fee for preparing his appraisal report was $1,800.00 as well as indicating that his fee for testifying was $100.00 per hour. General Statutes 13a-76 provides in part that "If the amount of the reassessment of such damages awarded to any such property owner exceeds the amount of the assessment such damages by the commission for such land, such trial referee shall award to such property owner such appraisal fees as such trial referee deems reasonable. . . ." This court finds the charge of $1,800.00 for Miner's appraisal to be reasonable and awards that amount to the plaintiffs under 13a-76. The court does not consider the request of $700.00 for Miner's trial testimony as encompassed in the "such appraisal fees" language of 13a-76 and, therefore, makes no allowance for that and, accordingly, that request is denied.
 IV
Finally, in their amended complaint the plaintiffs allege that they are entitled to additional damages under General Statutes 13a-76a for the state's alleged unreasonable delay in taking their property. Section 13a-76a provides:
 "Whenever a referee, in determining the amount of damages for the taking of land under this part, finds that there has been unreasonable delay between the filing of a map under the provisions of section 13a-57 and the filing of a certificate of taking under section 13a-73, he may award such additional damages as he may find resulting therefrom."
It is fully dispositive of this claim, which is briefed most scantily to point out that there is not one bit of evidence in this case to show the date the map referred to 13a-76a and13a-57 was filed. The plaintiff's proof was completely lacking on that statutory element and, therefore, the claim for damages under the statute lacks merit.
Some comment, however, should be made before leaving this matter. As already noted, the plaintiffs' brief asserts that just compensation for their property taken "requires the payment of damages in the range of $8,000.00 to $50,00.00." The plaintiff Bernard Pisacich had testified that he believed the subject property was worth $50,000.00 and this was not only because of its location and its potential for development as he explained but also that there was some discussion of the figure of $50,000.00. Parenthetically we note that the expert Miner never rendered any opinion of fair market value that exceeded $8,000.00 and that the plaintiffs' evidence on its assessed value was a "value" for assessment purposes of $6,914.00-both dramatically less than CT Page 3914 $50,000.00. In any event, the plaintiffs claim that "interest" of this type on their property ceased when it became known that the state was going to condemn it and that the alleged delay before the taking of June 2, 1989 caused them damages. Even if this claim was cognizable in this case, they simply have not proven any damages.
The plaintiffs maintain that once the state's plan to condemn the subject (and other property) became known to the general public in March 1988, that depressed the marketability of their property from that date forward to the taking date of June 3, 1989, and that "equity" requires that this fifteen months of depressed marketability "requires" an award of an additional fifteen months interest "in determining just compensation." Again, in making this claim for "equity," the plaintiffs overlook the complete lack of evidence in the filing date of that map. In making their argument they cite Colalucca v. Ives, 150 Conn. 521,530, 191 A.2d 340 (1963) which states that ". . . the question of what is just compensation is an equitable one rather than a strictly legal or technical one." In making this argument the plaintiffs' brief explicitly states that they are not claiming that the state' conduct "rises to a taking of [their] fee prior to June 2, 1989," yet they make this claim for additional damages despite not having adduced any evidence of the date of the filing of the map as required to trigger the statutes. See General Statutes 13a-76a, 13a-57. Their brief peculiarly does not even recognize this lack of evidence required by the statute.
Finally, on this issue the plaintiffs' brief states that a similar issue was addressed in In The Philadelphia Parkway, etc., 250 PA. 257, 95 A. 429 (1915). A close examination of that case indicates that it is readily distinguishable. In Philadelphia Parkway the conduct complained of had extended over some ten years. But more significantly, in that case the court found that what the defendant City of Philadelphia had done "constitute[d] a taking in the constitutional sense." In the Philadelphia Parkway, supra 432. The plaintiffs here explicitly make no such claim. Parenthetically, we note that the United States Supreme Court has said that "A reduction or increase in the value of property may occur by reason of litigation for or the beginning or completion of a project. Such changes in value are incidents of ownership. They cannot be considered as a `taking' in the constitutional sense." Danforth v. United States, 308 U.S. 271, 285,60 S.Ct. 231, 84 L.Ed. 631 (1959); see also City of Buffalo v. J. W. Clermont Co., 28 N.Y.2d 241, 321 N.Y.2d 345, 269 N.E.2d 1895 (1971). The court cannot accept the plaintiffs' claims on this branch of the case and the request for additional damages under 13a-76a is denied.
The plaintiffs, having been found aggrieved, it is ordered CT Page 3915 that judgment be entered in accordance with the foregoing.
 V
Arthur H. Healy, State Trial Referee
FOOTNOTES