MARY HOYE LYNCH, EXECUTRIX (ESTATE OF MARY B. HOYE), ET AL. v. TOWN OF WEST HARTFORD

HOUSE, C. J., SHAPIRO, LOISELLE, MACDONALD and BOGDANSKI, Js.

Argued June 6—decision released August 27, 1974

*James E. Heffernan, Jr.,* with whom, on the brief, were *Richard P. Heffernan* and *Joseph A. Hourihan,* for the appellant (defendant).

*Palmer S. McGee, Jr.,* for the appellees (plaintiffs).

BOGDANSKI, J. This is an appeal by the defendant, the town of West Hartford, from a reassessment of damages for its condemnation of land for redevelopment purposes. The plaintiffs are the Hoye family which owns the land and Henry Porter who owns a thirty-foot-wide right of way across the land. The plaintiffs applied to the Superior Court for a review of the statement of compensation in the amount of $53,300 filed by the town. The matter was referred to *Hon. Raymond E. Baldwin,* state referee, who held a hearing and assessed damages in the amount of $195,000 to the Hoye family and $51,800 to Porter. From the judgment rendered for the plaintiffs, the town has appealed to this court. Only the award to the Hoye family is in dispute in this appeal.

For purposes of this appeal, the finding may be summarized as follows: The Hoye family owned approximately 2.67 acres of land consisting of three adjoining parcels, identified as parcels 1, 2 and 3, at the eastern end of Rose Avenue in the southwest section of West Hartford. The town of West Hart-

ford recognized that Rose Avenue terminated at the beginning of the Hoye family property by erecting a sign stating "End of Street" and by describing the property in the statement of compensation as "beginning on an iron pin at the terminus of Rose Avenue" and as "running . . . across the terminus of Rose Avenue." Parcel 1 was bounded on the north by Piper Brook, on the west by land of others, on the south by Rose Avenue, and on the east by parcel 2 and by land of others north of parcel 2. Parcel 3 was bounded on the west by the eastern terminus of Rose Avenue and by land of others lying south of Rose Avenue, on the north by parcel 2 and by land of others to the east of parcel 2, on the south by land of others, and on the east by Piper Brook. The Porter right of way, which the Hoye family had granted Henry Porter's predecessor in interest, began at the terminus of Rose Avenue and extended across the northwest portion of parcel 3 along the southern boundary of parcel 2 to property owned by Porter on which a shopping center was located. Parcel 2 was bounded on the south by parcel 3, on the west by parcel 1, and on the north and east by land of others. The southwest corner of parcel 2 thus was located at the point of intersection of the eastern end of Rose Avenue, the southern boundary of parcel 1, and the northern boundary of parcel 3.

The referee found that parcel 2 had access to Rose Avenue only through parcels 1 and 3. On January 21, 1971, as part of the Piper Brook urban renewal project, the town of West Hartford took parcels 1 and 3, approximately 2.23 acres, leaving the Hoye family with parcel 2. The purpose of the project was to increase the amount of industrial land available in the town.

From 1960 until the taking the entire Hoye family tract was used for construction purposes. Parcels 2 and 3 were zoned for general industrial uses. An industrial garage building, specially designed and built for the repair and maintenance of heavy road-building and construction equipment, was located on parcel 2. At each end of the building was a large overhead door designed to permit construction equipment to be driven directly through the garage for servicing. Parcel 3 was unimproved land on which large equipment, such as power shovels and bulldozers, could be positioned so that they could be driven through the garage. Parcel 3 was also used for the storage of materials and supplies. As a result of the loss of parcel 3, the limited amount of Hoye family land remaining south of the industrial building did not permit the maneuvering of large vehicles, thus preventing the use of the building for their maintenance and repair.

Even though parcel 1 was zoned residential, it had been used since 1960 for the storage of supplies and equipment without objection by the town. Located also on parcel 1 was a residence and a one-car detached garage, occupied and used by a Hoye family employee who served as a caretaker of the premises.

In 1961 the Hoye family had applied for a zone change for parcel 1 from residential to industrial. At that time the town's plan of development showed that the future use of parcel 1 should be residential. When the application came before the town council for consideration, at least three councilmen stated that parcel 1 should be rezoned industrial, but the council denied the application. The referee found that the reason for the denial was the residential

classification in the plan of development and the need to protect other residential properties on Rose Avenue. In 1963, however, the town amended its plan of development by reclassifying the entire area around Rose Avenue, including parcel 1, from residential to industrial. The referee concluded that on the basis of the reclassification and the openly industrial use to which parcel 1 had been put, there was a reasonable probability that an application filed after 1963 for a change of zone for parcel 1 from residential to industrial would have been granted. The referee found that the "highest and best use of Parcel 1 was as a caretaker's residence and storage area in conjunction with the use of the entire 2.67 acre parcel for carrying on the business of a heavy construction contractor." He concluded that the value of parcel 1 should be appraised in light of the reasonable probability that an application for a change of zone to industrial would have been granted.

The referee found that in view of its size, location and improvements, the highest and best use of the entire Hoye family property at the time of the taking was for the business of a heavy construction contractor such as the Hoye family had previously conducted. An area of between two and three acres was necessary for that business in order to store equipment and supplies and to permit the operation of the specialized repair and maintenance garage. Although parts of parcels 1 and 3 were below the Piper Brook flood-plain level, that area could still be used for the storage of construction materials impervious to temporary water exposure. The referee concluded that after parcels 1 and 3 were taken, parcel 2 was greatly diminished in value, in part because it no longer had access to a public high-

way and was cut off from public utilities, and in part because it was now so limited in area that it could not be used for the repair of heavy construction equipment.

Although parcel 2 may have been cut off from Rose Avenue as a consequence of the taking, the town proposed at an indefinite time in the future to relocate Shield Street along its western boundary. The relocating of Shield Street was dependent for its completion on the relocation of Piper Brook, which meanders through the area. The appraiser who testified for the town conceded on cross-examination that he could not say when, if ever, the relocation of Shield Street would be completed.

Three appraisers testified as to the damages incurred by the Hoye family, which they calculated as the difference between the value of the property before the taking and the value of the property after the taking. The referee concluded that the value of the property before the taking was $252,574.50; that the value after the taking was $57,583.00; and that the damages sustained by the Hoye family amounted to $194,991.50, which he rounded off to $195.000.00.[1]

---

[1] The referee calculated the pretaking value as follows:

| | |
|---|---|
| Dwelling ........................... | $ 10,000.00 |
| Garage ............................. | 750.00 |
| Industrial Building .................... | 62,000.00 |
| Land ............................... | 174,724.50 |
| Paving, gas pump, tanks .............. | 5,100.00 |
| | $ 252,574.50 |

He calculated the posttaking value as follows:

| | |
|---|---|
| Industrial Garage .................... | $ 38,500.00 |
| Land ............................... | 19,083.00 |
| | $ 57,583.00 |

In this appeal, the town has assigned and briefed four claimed errors: (1) that the referee erred in finding that there was a reasonable probability that a request for a zone change for parcel 1 would have been granted; (2) that he erred in calculating the pretaking value of the Hoye family land by applying a uniform value per square foot to the entire tract; (3) that he erred in concluding that parcel 2 was cut off from Rose Avenue; and (4) that he erred in refusing to take into account the enhancement in the value of parcel 2 to be expected from the relocation of Shield Street and other eventual improvements. The town's other assignments of error, which are numerous, have not been briefed and are treated as abandoned. *Multiplastics, Inc.* v. *Arch Industries, Inc.*, 166 Conn. 280, 282 n.1, 348 A.2d 618.

The owner of land taken by condemnation is entitled to be paid just compensation. Conn. Const. art. I § 11. If the taking is partial, the usual measure of damages is the difference between the market value of the whole tract with its improvements before the taking and the market value of what remained of it thereafter. Severance damages to the parcel remaining are thereby included. *Meriden* v. *Ives,* 165 Conn. 768, 773, 345 A.2d 13; *Connecticut Printers, Inc.* v. *Redevelopment Agency,* 159 Conn. 407, 414, 270 A.2d 549. The "fair market value" is the price that the trier reasonably thinks would result from fair negotiations between a willing seller and a willing buyer. The valuation should ordinarily be based on the "highest and best" possible use of the land. *Connecticut Printers, Inc.* v. *Redevelopment Agency,* supra, 411–13.

The probability of a favorable zone change is an element which might influence the price which a

purchaser in a voluntary transaction would pay. Accordingly, *Budney* v. *Ives,* 156 Conn. 83, 239 A.2d 482, held that where a zone change is reasonably probable as of the taking date, its probability may properly be considered in determining the fair market value of property taken by eminent domain. The trier must determine the value of the property as zoned on the taking date, taking into account the likelihood of a zone change, and not as if the property had already been rezoned. *Budney* v. *Ives,* supra, 88–89.

The existence of a reasonable probability of a zone change is a question of fact for the trier. In *Budney* the property owners actually had an application pending before the town zoning commission on the taking date, and there was testimony from the town planner and the commission chairman that the application would have been granted but for the taking. In the present case the town emphasizes that no application for a zone change was pending, and that no current member of the West Hartford town council or town plan and zoning commission testified as to the probability of a zone change had an application been made. While the factual situation here may not be as compelling as in *Budney,* there is nonetheless sufficient evidence to support the referee's conclusion that a change of zone for parcel 1 from residential to industrial would have been reasonably probable had it been sought. As the referee found, parcel 1 had been used openly and without objection for industrial purposes, and the reason for the 1961 denial of a zone change had been eliminated in 1963. Moreover, two appraisers testified that in their opinions a change of zone application after 1963 would have been granted.

The fact that parcel 1 had been devoted to an unlawful use after 1961 did not prevent the trier from considering the probability that the legal prohibition would have been removed had that been requested. See 4 Nichols, Eminent Domain (Rev. 3d Ed.) § 12-3143.

The town also argues that the referee's valuation of the Hoye family land prior to the taking by using a uniform price of $1.50 per square foot was improper because a significant portion of parcels 1 and 3 was below the established Piper Brook floodplain level and hence different from the rest of the tract in adaptability and topography. The town claims in its brief that "[w]here different segments of a parcel are susceptible of valuation on the basis of differing highest and best uses, it is error to attribute an overall or average unit of value to the entire parcel." 4 Nichols, op. cit. § 12-314, pp. 12-220—12-222. The principle is sound but not pertinent, since the referee did not find this to be a case in which segments of a tract of land had different highest and best uses.

The three appraisers who testified valued the land at $224,776, $215,500, and $79,390 respectively. Two of the appraisers, F. G. Brennan and J. F. Mulready, valued the Hoye family property on the basis that its highest and best use was as a single tract devoted to the construction business previously carried on by the Hoye family. Brennan compared the land with four nearby properties which had recently been sold and after making various adjustments for relevant differences concluded that the land had a pretaking value of $1.85 per square foot. He arrived at the figure of $215,500 for its total

value. Mulready analyzed three comparable sales, made adjustments he deemed appropriate, and found that the land had a value of $2.00 per square foot, except for approximately 16,000 square feet located on parcel 1 which he valued at $1.50 per square foot because of its lower elevation. He concluded that the total value of the land was $224,776. The third appraiser, K. G. Kaffenberger, valued the three parcels individually, rejecting the view that their highest and best use was as a single property devoted to the heavy construction business. He concluded that the land was worth $79,390 at the time of taking.

"No one appraisal method was controlling on [the referee]. . . . He had the right to accept so much of the testimony of the experts and the recognized appraisal methods which they employed as he found applicable. . . . The exercise of this right would be reviewable only if it were apparent that 'the referee misapplied or overlooked, or gave a wrong or improper effect to, any test or consideration which it was his duty to regard.' " *Stanley Works* v. *New Britain Redevelopment Agency,* 155 Conn. 86, 99, 230 A.2d 9. The referee appraised the Hoye family land at $174,724.50. Having reasonably concluded, on the basis of the evidence before him, that the highest and best use of the entire Hoye family property was in the heavy construction business to which it had been put, the referee was entitled to reject the appraisal of Kaffenberger based on a contrary assumption and to disregard irrelevant variations in terrain in adopting a uniform valuation for the land prior to the taking. The low elevation of portions of parcels 1 and 3 did not render those areas unsuitable for use in the construction business because it did not prevent the storage there of some

construction materials. The referee was, therefore, not required to devalue portions of the Hoye family property on the basis of their elevation.

The town also argues that after the taking, parcel 2 was not without access to a public highway because the right of way extending from Rose Avenue along the southern boundary of parcel 2, which had been granted to Henry Porter's predecessor, had in fact been dedicated to the general public; that dedication, the town argues, will continue in existence so long as Rose Avenue itself does. The town's contention is based on testimony, not incorporated in the referee's finding, to the effect that in order to obtain a permit in 1950 to build the structure on parcel 2, the then owner, John R. Hoye, was required to show frontage on an approved or accepted street; that parcel 2 had such frontage over a paper street of record; and that the extension of Rose Avenue was paved over that paper street of record by Hoye according to town specifications. The thirty-foot-wide extension was later granted as a right of way to Henry Porter's predecessor in title in order to provide access to a shopping center on adjoining land. The town does not argue that it ever formally accepted the Rose Avenue extension in accordance with statutory requirements;[2] see General Statutes § 13a-48; nor does the town allege compliance with the requirements of General Statutes § 13a-71, pertaining to the layout of highways less than fifty feet in width by private persons. See *Thompson* v. *Portland,* 159 Conn. 107, 266 A.2d

[2] In fact, the town conceded that it did not ever accept the Rose Avenue extension, and that this fact was communicated to the general public by the "End of Street" sign posted until the taking date at the terminus of Rose Avenue. The town also states that the sign served to protect it from liability.

893. But the town claims that a dedication to the public resulted when the acts of Hoye in obtaining permission to construct the building on parcel 2 and the Rose Avenue extension were followed by acceptance by the unorganized public which used the extension to reach the property of Porter.

A common-law dedication is "the devotion of property to a public use by an unequivocal act of the owner, manifesting an intention that it shall be accepted and used presently or in the future." 11 McQuillan, Municipal Corporations (3d Ed. Rev. 1964) § 33.02, p. 628. Its essential elements are the owner's intention to dedicate, which may be either express or implied, and an acceptance of the dedication by the public. Usually the public acceptance is established by proof of "a general user of the property by the public for a period long enough to indicate that the public is acting on the basis of a claimed public right resulting from the dedicatory act or acts of the owner." 11 McQuillan, op. cit. § 33.50, p. 761; *Wamphassuc Pt. Prop. Owners Assn. v. Public Utilities Commission,* 154 Conn. 674, 681, 228 A.2d 513; *Whippoorwill Crest Co.* v. *Stratford,* 145 Conn. 268, 271, 141 A.2d 241; *LaChappelle* v. *Jewett City,* 121 Conn. 381, 386–87, 185 A. 175. "[M]ere permission on the part of the owner to the public to use the land as a way, without more, will not constitute an intention to dedicate, since a temporary right to use a private way is in the nature of a mere license, revocable at pleasure, and does not in any sense establish the requisite intent. Accordingly, mere permissive use of land as a street or the like, where the user is consistent with the assertion of ownership by the alleged dedicator, does not of itself constitute a dedication nor demonstrate a dedicatory intention." 11 McQuillan, op.

cit. § 33.32, pp. 710–11. The existence of an intent to dedicate and of acceptance by the public is a question of fact for the trier. *Whippoorwill Crest Co.* v. *Stratford,* supra, 272.

The referee's refusal to find a dedication to the public in this case cannot be disturbed. There was a near total absence of evidence from which he could have so found. No question of an estoppel to deny dedication is present in this case. In light of the continued and explicit nonacceptance by the town, the construction of the building on parcel 2 and the Rose Avenue extension can hardly be said to constitute evidence of an intent to dedicate. Such an intent was negatived by the subsequent grant of a right of way over the highway supposedly already dedicated to the public. Moreover, the public use of the right of way to reach the Porter property was permissive and not in the nature of a claim of right. The town simply failed to make out a case of dedication before the referee, and that failure cannot be remedied on this appeal.

The town's final argument does not merit extended discussion. The town asserts that the referee erred in failing to take into account the enhancement in value to parcel 2 which would result from the general improvement in conditions to be brought about by the contemplated urban renewal project, and, in particular, by the future relocation of Shield Street along its western boundary. The three appraisers who testified as to the posttaking value of parcel 2 appraised it at $23,100, $20,000, and $57,250. The latter figure was offered by the appraiser who testified on behalf of the town. The referee concluded that the posttaking value of parcel 2 was $57,583, a figure higher than any obtained

by the appraisers. Moreover, the uncertainty attending the expected date of the Shield Street relocation was a significant element for the referee to weigh on the issue of enhancement. "Ultimately, the determination of the value of the land depended on the considered judgment of the referee, taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties." *Bennett* v. *New Haven Redevelopment Agency,* 148 Conn. 513, 516, 172 A.2d 612.

There is no error.

In this opinion the other judges concurred.