[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
Defendant City of Middletown (City), acting under the provisions of General Statutes Chapter 130, condemned certain real property for the purpose of erecting a police station thereon. International Data Systems (IDS) and Middletown Realty Associates Limited Partnership (MRALP), claiming to be aggrieved by the statement of compensation filed by the defendant City, have instituted the present action under the provisions of General Statutes § 8-129. On October 27, 1997, the cases were consolidated for trial under the provisions of Practice Book § 84A, now Practice Book (1998 Rev.) § 9-5.
The basic facts underlying these actions are not greatly in dispute and may be summarized as follows:
At all times material to these proceedings MRALP held title to commercial realty on the easterly side of Main Street in the City of Middletown known as Riverview Center. MRALP was an entity under the control of Konover Management Corporation. The property had been part of a redevelopment project and consisted of land with improvements consisting of two buildings with a pedestrian mall. The buildings have been designated 100 and 200 Riverview Center.
On or before March 1, 1996, Glenn Russo, a young man who had experienced success in the development of residential property, became interested in acquiring Riverview Center.
On March 1, 1996, Russo acquired an option from MRALP to purchase Riverview Center using a corporation which he controlled known as Cambridge Homes, Inc. Russo also controlled IDS which on July 26, 1996, leased a portion of the premises from MRALP. Subsequently, the option and an amendment were assigned to IDS.
On November 22, 1996, the City filed a Notice and Statement of Compensation for the taking of that portion of the premises known as 200 Riverview Center and deposited the sum of $260,000 as compensation to persons having a record interest therein with CT Page 10483 the clerk of the superior court in accordance with General Statutes § 8-129. A copy was recorded in the Middletown land records. On December 6, 1996, a certificate of taking was recorded in the land records vesting title in the City. The present application for review of the compensation ensued.
On December 17, 1997, a corrected Statement of Compensation was filed with the court. No additional assessment of damages was made at this time. This document was recorded in the land records on the same date, and on December 29, 1997, a corrected certificate of taking was recorded in the land records.
 I.
General Statutes § 8-132 limits appeals by persons claiming compensation in condemnation actions to persons aggrieved by the statement of compensation. The question of aggrievement is a jurisdictional issue and presents a question of fact for the determination of the trial court with the burden of proving aggrievement resting upon the plaintiffs who have alleged it. Nader v. Altermatt, 166 Conn. 43, 59, 347 A.2d 89 (1974). "Pleading and proof of aggrievement [are prerequisites] to the trial court's jurisdiction over the subject matter of the plaintiff's appeal." Beckish v. Manafort, 175 Conn. 415, 419,399 A.2d 1274 (1978). "The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in the subject matter of the decision, as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party . . . must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the decision.'"Mystic MarinelifeAquarium Inc. v. Gill, 175 Conn. 483, 493, 400 A.2d 726 (1978), quoting Nader v. Altermatt, supra, 51.
MRALP, being the owner of the property at the time of the taking, is found to be aggrieved. Bossert Corporation v. Norwalk,157 Conn. 279, 285, 253 A.2d 39 (1968).
In its revised application dated July 14, 1997, IDS claimed aggrievement and alleged an interest in Riverview Center by virtue of an unrecorded option and other documents including a lease, all of which were admitted into evidence and the validity of which have not been questioned by the evidence. CT Page 10484
On July 15, 1997, the City filed a special defense alleging that IDS lacks standing as an aggrieved person since the option and the lease had previously expired and IDS had no legal or equitable interest in the property.
The first of the documents upon which IDS relies is an option agreement between MRALP and Cambridge Homes, Inc. This option gave Cambridge Homes, Inc. the right to purchase Riverview Center for $500,000. The option was to expire at 5:00 p. m., September 1, 1996, without notice. A rider attached to the option allowed an extension to the closing date. Paragraph 4 of the option provided that if the buyer did not exercise the option prior to the termination date, the option would terminate and the buyer would have no further rights in the property.
The second document was an amendment to the option effective April 17, 1996. The evidence indicated that at this time Russo had entered into discussions with the City f concerning a proposal that he would construct the police station at 200 Riverview Center and convey it to the City. The amendment recited this situation and noted that the City would not enter into any agreement with Russo unless a referendum authorizing bonding for the police station project was approved by the voters.
Paragraph 4 of the amendment provided:
 4. It is expressly agreed that if the Referendum is passed, Buyer shall be deemed to have exercised the option, and Buyer shall close on the purchase of the Property in accordance with the terms of the Option Agreement (as amended hereby) on a weekday not less than ten (10) nor more than twenty one (21) days after the Referendum is passed.
In its amended application, IDS also relied on a lease from MRALP to IDS dated July 26, 1996, of approximately 4,536 square feet of floor area at Riverview Center for use as a general business office. The lease was to expire on January 31, 1997. Paragraph 16 of the lease recognized IDS as an "Affiliate Buyer" and mentioned the option agreement and the amendment.
The last document relied upon by IDS was an assignment whereby Cambridge Homes, Inc. assigned all of its rights under the option and the amendment to IDS.
Problems developed between the City and Russo concerning the CT Page 10485 police station and no agreement was ever reached whereby he would construct the station.
On November 5, 1996, the referendum authorizing construction of the police station was approved by the voters and on November 22, 1996, the City filed its Notice and Statement of Compensation starting the condemnation proceedings.
IDS did not exercise its option by closing on the purchase of the property within twenty-one days after passage of the referendum as required by paragraph 4 of the amendment to the option.
IDS has not alleged that it acquired any interest in Riverview Center except under the documents above mentioned and there was no evidence of any other conveyance or transfer of rights or title to IDS. All evidence confirms that MRALP retained title to Riverview Center.
Under the special defense the City now argues that since IDS did not exercise its option within the time limited by the options, as amended, its option rights terminated and it has no legal or equitable interest in Riverview Center and could not therefore be aggrieved and its appeal should be dismissed.
The City argues that IDS is not aggrieved, as required by General Statutes § 8-132, and, therefore, that IDS's appeal should be dismissed for lack of subject matter jurisdiction. The City contends that IDS does not have standing since it has not sustained any real interest in the property throughout the course of this appeal.
Claiming that it is aggrieved, IDS argues that aggrievement is determined at the time the statement of compensation is filed. Although an aggrieved party must have a legal interest in the property which is the subject of the appeal and must sustain that interest throughout the course of the appeal, IDS argues that it was relieved of its obligation to exercise the option by the City's filing of the notice of taking. IDS contends that since the City filed a notice of taking, MRALP could not have conveyed title to IDS.[1]
"[A] claim that this court lacks subject matter jurisdiction [may be raised] at any time. Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy CT Page 10486 presented by the action before it. . . ." (Internal quotation marks omitted.) Dowling v. Slotnik, 244 Conn. 781, 787, ___ A.2d ___ (1998).
"Standing is not a technical rule intended to keep aggrieved parties out of court; nor is it a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented." (Internal quotation marks omitted.) R R Pool Home Inc. v. Zoning Board ofAppeals, 43 Conn. App. 563, 569-70, 684 A.2d 1207 (1996). The concepts of aggrievement and standing are intended to protect plaintiffs who have "more than an abstract interest in the property or the issue. . . ." (Internal quotation marks omitted.) Id., 570 (holding that a lessee who contracted to purchase property during an appeal regarding that property was aggrieved and had standing in that appeal).
In relevant part, General Statutes § 8-132 states, "[a]ny person claiming to be aggrieved by the statement of compensation filed by the redevelopment agency may . . . apply to the superior court . . . for a review of such statement of compensation. . . ." To be aggrieved, a party must have a legal interest in the property which is the subject of the appeal and must sustain that interest throughout the course of the appeal.Craig v. Maher, 174 Conn. 8, 9, 381 A.2d 531 (1977).
The City relies to a large extent on Goldfeld v. Planning Zoning Commission, 3 Conn. App. 172, 177, 486 A.2d 646 (1985), in which our Appellate Court held that a plaintiff was not aggrieved by a decision of a Planning Zoning Commission denying the plaintiff's application for a change of zone where the plaintiff's option to purchase the property expired approximately six weeks before the trial court rendered its judgment. Id.
The present case is unlike Goldfeld v. Planning ZoningCommission, supra, because in that case the plaintiff could have exercised its option to purchase the property and maintained an interest in the property throughout the course of the appeal. In the present case, IDS could not exercise its option to purchase the property after the City filed its notice of condemnation since MRALP could not have thereafter conveyed the property to IDS. Article first, § 11 of the Connecticut constitution CT Page 10487 provides, "[t]he property of no person shall be taken for public use, without just compensation therefor." "The word `taken' in article first, § 11 . . . means the exclusion of the owner from his private use and possession, and the assumption of the use and possession for the public purpose by the authority exercising the right of eminent domain." (Internal quotation marks omitted.) Tamm v. Burns, 222 Conn. 280, 284, 610 A.2d 590
(1992).
Upon the taking of property through condemnation, the holder of an option to purchase that property is entitled to compensation in the amount of the excess of the condemnation award over the optioned purchase price. Texaco Inc. v.Commissioner of Transportation, 34 Conn. Sup. 194, 196-97,383 A.2d 1060 (1977)." Every kind of right or interest in property which has a market value must be compensated for in condemnation proceedings.'" Id., 196, quoting Canterbury Realty Co. v. Ives,153 Conn. 377, 384, 216 A.2d 426 (1966). Since IDS held an option to purchase the property at the date the City filed its notice of condemnation, IDS cannot be divested of its right in the property without just compensation. Texaco, Inc. v. Commissioner ofTransportation, supra, 196.[2] It must thus be concluded that IDS is an aggrieved part and has standing in this case.
 II.
"Under our law, a state referee sitting as a court on appeals in condemnation cases is more than just a trier of fact or an arbitrator of differing opinions of witnesses. He is charged by the General Statutes and the decisions of this court with the duty of making an independent determination of value and fair compensation in the light of all the circumstances, the evidence, his general knowledge and his viewing of the premises. . . ." (Internal quotation marks omitted.) Minicucci v. Commissioner ofTransportation 211 Conn. 382, 388, 559 A.2d 216 (1989). "Valuation is a matter of fact to be determined by the trier's independent judgment. . . . In determining fair market value, the trier may select the method of valuation most appropriate to the case before it. . . ." (Citations omitted.) Cappiello v.Commissioner of Transportation, 203 Conn. 675, 679-80,525 A.2d 1348 (1987).
"Damages recoverable for a partial taking, such as here, are ordinarily measured by determining the difference between the market value of the whole tract as it lay before the taking and CT Page 10488 the market value of what remained of it thereafter, taking into consideration the changes contemplated in the improvement and those which are so possible of occurrence in the future that they may reasonably be held to affect market value." (Internal quotation marks omitted.) Cappiello v. Commissioner ofTransportation, supra, 203 Conn. 679; see also Laurel. Inc. v.Commissioner of Transportation, 180 Conn. 11, 36, 428 A.2d 789
(1980); D'Addario v. Commissioner of Transportation,180 Conn. 355, 363, 429 A.2d 890 (1980); Tandet v. Urban RedevelopmentCommission, 179 Conn. 293, 298, 426 A.2d 280 (1979). "Severance damages to the parcel remaining are thereby included. . . . The fair market value is the price that the trier reasonably thinks would result from fair negotiations between a willing seller and a willing buyer. The valuation should ordinarily be based on the highest and best possible use of the land." (Citations omitted; internal quotation marks omitted.) Laurel. Inc. v. Commissionerof Transportation, supra, 36-37.
Application of the `before and after' rule to compute compensation for a partial taking was [approved by the Supreme Court and upheld] in Hanson v. Commissioner of Transportation,176 Conn. 391, 400, 408 A.2d 8 (1979). [The Supreme Court] has also held that where only a portion of a tract is taken for the public use, the award will include the value of the part taken as well as any damages visited upon the remainder as a result of the taking. . . . These principles of Connecticut law on the assessment of damages for a partial taking reflect the judicial philosophy that just compensation requires that the condemnee shall be put in as good a condition pecuniarily as he would have been in had the property not been taken." (Citations omitted; internal quotation marks omitted.) Laurel. Inc. v. Commissionerof Transp. of Conn., supra, 180 Conn. 36-37; see also D'Addariov. Commissioner of Transportation, supra, 180 Conn. 365; Tandetv. Urban Redevelopment Commission, supra, 179 Conn. 298-99.
Riverview Center had been part of an urban renewal project started in 1957. It is situated on the easterly side of Main Street in the City of Middletown. It has frontage on two other public streets and contains approximately 2.97 acres. The property is at grade on Main Street and slopes down towards its easterly boundary where it is at basement level with loading docks and an access roadway leading to College Street.
The entire property has been improved with buildings, concrete and asphalt. There is outside lighting, drainage, CT Page 10489 retaining walls, a canopy, a kiosk building and minimal landscaping.
At the time of the condemnation, there were two buildings on the premises constructed in 1965. Both buildings were of steel frame construction with flat roofs, masonry walls and brick exteriors.
Two hundred Riverview Center, the subject of the condemnation, formerly a Sears, Roebuck store, was then vacant. It was a one-story building with a partially finished basement. The front part of the building rested on a concrete slab. The finished basement was at grade with access to the roadway leading to College Street. The main level consisted of 47,000 square feet designed to be occupied by a single tenant and used as a sales area. The basement consisted of 4,100 square feet and had been used as a storage area.
This building had been unoccupied for about three years. Although general maintenance had been kept up, the building had deteriorated. The roof was in need of repair and the interior finish was in poor condition.
One hundred Riverview Center, the portion remaining after the condemnation, is a two-story building with a basement. Historically, the first floor was primarily devoted to retail use. The second floor was rented for offices and a supermarket had once occupied the basement. The building was in average condition with obvious deterioration. The vacancy rate was approximately 80 percent.
There was an open pedestrian mall between the buildings at the Main Street level. This mall, or walkway, extended between the buildings from Main Street easterly to the second level of the municipal parking garage which abutted the property.
The municipal parking garage provided limited parking to Riverview Center tenants and patrons.
At the time of the taking, Riverview Center was largely vacant. Market conditions for office space were competitive and somewhat depressed. There was little demand for retail space in downtown Middletown. This was particularly true for the large scale retail space formerly occupied by Sears at 200 Riverview Center. With such large scale retail facilities concentrated in CT Page 10490 the outlying malls and shopping centers, the possibility of a tenant on the scale of Sears again locating in the building was remote.
 III
In a condemnation proceeding, the condemnees are entitled to be paid just compensation. The amount that constitutes just compensation is the market value of the condemned property when it is put to its highest and best use at the time of the taking. South Farms Associates Limited Partnership v. Burns,35 Conn. App. 9, 16, 644 A.2d 940, cert. denied, 231 Conn. 912,648 A.2d 157 (1994).
In determining fair market value, the trial court should determine the highest and best possible use of the property.D'Addario v. Commissioner of Transportation, supra,180 Conn. 365. "The highest and best use concept . . . has to do with the use which will most likely produce the highest market value, greatest financial return, or the most profit from the use of a particular piece of real estate." (Internal quotation marks omitted.) Connecticut Printers. Inc. v. Redevelopment Agency,159 Conn. 407, 411, 270 A.2d 549 (1970). "The question of the highest and best use of the property as a factor in the ultimate valuation of the property is an issue of fact for the trier, based on his evaluation of the testimony of the appraisers, the claims of the parties, his own general knowledge of the elements of value and any visual inspection of the property which he may have made." Stamford Apartments Co. v. Stamford, 203 Conn. 586,592, 525 A.2d 1327 (1987).
The appraiser who testified for the defendant City opined that the highest and best use of Riverview Center would be a continued office and retail use of the existing buildings and improvements. The appraiser who was called by plaintiff IDS testified that the highest and best use of the property would be to demolish the retail store at 200 Riverview Center, construct strip stores along Main Street and establish off-street parking for 120 vehicles at two levels. The parking could then be made available to those occupying the office and retail space on the premises.
The use advocated by IDS' appraiser as the highest and best use of the property was that envisioned by Glenn Russo, the principal of IDS. The defendant City argues that in assessing CT Page 10491 damages the Court must consider the highest and best use of the property at the time of the taking and that the use advocated by the IDS appraiser involved an improbable change in the property.
This was the situation presented in Budney v. Ives,156 Conn. 83, 239 A.2d 482 (1968), where the court held that the reasonable probability of a change of zone could be considered in valuating property taken by eminent domain. Claims of proposed changes in the property cannot be considered in valuation if those claims are based on "[w]ishful thinking, optimistic conjecture, speculation, rumor [or] unfounded prognostications." Id.,156 Conn. 89-90. In Minicucci v. Commissioner of Transportation,
supra, 211 Conn. 386, the Court, citing Budney v. Ives, held that the trial court properly declined to consider the plaintiff's claims for increased valuation on the basis that the property could be subdivided since the plaintiffs had not, in the fourteen years they had owned the property, filed a subdivision application or prepared a plan. In Tandet v. Urban RedevelopmentCommission, supra, 179 Conn. 300-01, the Court found that the trial court erred in basing valuation on the possibility that property would probably have been converted to an office building in eight years since distant projections are speculative and unreliable.
In determining whether to consider the plaintiff's proposed optimum use of the property, the court must consider whether the proposed changes are "physically possible, legally permissible, financially feasible, and maximally productive." South FarmsAssociates Limited Partnership v. Burns, supra, 35 Conn. App. 16. In Transportation Plaza Associates v. Powers, 203 Conn,. 364, 377, 525 A.2d 68 (1987), the Supreme Court found that the trial court properly concluded that the highest and best use of the property taken by eminent domain was an office building. The court stated that, "[e]vidence of the special adaptability of land for a particular purpose is properly admitted if there is a reasonable probability that the land could be so used within a reasonable time and with economic feasibility." Id., 375. See also Sorenson Transportation Co. v. State, 3 Conn. App. 329, 331,488 A.2d 458, cert. denied 196 Conn. 801, 491 A.2d 1105 (1985);Lynch v. West Hartford, 167 Conn. 67, 80, 355 A.2d 42 (1974).
The evidence indicates that Russo became interested in acquiring the Riverfront Center property in November or December of 1995. He thoroughly inspected the buildings and on March 1, 1996, received the option which would enable the company CT Page 10492 Cambridge Homes, Inc. to purchase the property for $500,000. If the option was exercised after June 1, 1996, the price would increase to $600,000.
Russo felt that the property could be made profitable if it was developed for office space with dedicated parking for the tenants. He planned to accomplish this by demolishing the front portion of 200 Riverview Center which had been constructed on cement slabs and use this as a parking area. The remaining portions of the building could be converted to office space. Zoning requirements necessitated a modification of this plan to the extent that a portion of 200 Riverview fronting on Main Street 25 feet in depth would have to be left standing for retail shops. The basement of 200 Riverview Center, formerly used for storage, would be converted to a parking garage. Russo determined that this plan would provide 120 parking spaces which he determined would be sufficient to meet the needs for dedicated parking for the tenants of Riverview Center.
Prior to the time of condemnation, Russo had hired two sales people to contact prospective tenants and he had involvement with a number of contractors and engineers. No detailed architectural working plans on specifications had been drawn, but a conceptual drawing had been prepared by a graphic artist. Large scale drawings were prepared by Russo just prior to trial. No site plan or demolition plan had been prepared or submitted to the appropriate municipal agencies. It is probable, however, that demolition had been discussed with a City official.
Whether or not Russo's plan should be considered in determining value in this case requires the application of the law as set forth in Budney v. Ives, supra, 156 Conn. 83, andSouth Farms Associates Limited Partnership v. Burns, supra,35 Conn. App. 16, as well as the other cases cited to the fact of this case.
One of the factors which must be considered is whether implementation of Russo's plan was physically possible. Although no specific plan had been prepared, the evidence confirms that the demolition and construction required under the plan could probably be carried out without great difficulty. It must be found then that the contemplated project was physically possible.
It must also be concluded that Russo's plan for the property was legally permissible. Riverview Center was located in the B-1 CT Page 10493 Central Business Zone and all contemplated use would be in compliance with the zoning regulations. The only zoning problem involved was the requirement that retail space be retained along Main Street and that a second story would have to be added. The evidence indicated that this could be done without great difficulty. Also, an attorney experienced in shepherding projects such as this through Middletown's zoning agencies, testified that this attempt to improve the depressed area in the center of the City would have the sympathy of the authorities.
While it is true no site plan had been submitted, it must be concluded that such a plan could have been prepared in compliance with the code and there is a strong probability that it would have been approved. General Statutes § 8-3 (g); AlliedPlywood Inc. v. Planning Zoning Commission, 2 Conn. App. 506,512, 480 A.2d 584, cert. denied, 194 Conn. 868, 483 A.2d 612
(1984); Lynch v. West Hartford, supra, 167 Conn. 74.
Aside from the zoning regulations and environmental requirements, no other possible legal impediments to Russo's plan were presented. The only environmental problem appears to have been asbestos removal. Although the cost of dealing with the asbestos problems was in dispute, there is no doubt but that all regulations could be complied with.
Whether Russo's plan was feasible from a financial standpoint or was based upon wishful thinking, optimistic conjecture, speculation or unfounded prognostications requires a more careful analysis of the evidence. On this issue, plaintiffs have the burden of proof. Levine v. Stamford. 174 Conn. 234, 235,386 A.2d 216 (1978).
Cambridge Homes, Inc.'s original option had a selling price of $500,000 with a provision that if the option was exercised after June 1, 1996, the price would be increased by $100,000. On April 17, 1996, the option agreement was amended and the purchase price was increased to $750,000.[3] The provision for the $100,000 increase if the option was exercised after June 1, 1996, was retained so that on the date of taking the purchase price was $850,000.
The cost of Russo's plan was estimated by him and his appraiser to be $1,844,000. This was broken down into $1,000,000 for demolition and construction of office and retail space. The balance would be required to prepare the property for individual CT Page 10494 tenants. It was planned that the project would be self supporting. Russo 1, intended to proceed without bank financing using his own funds and letting the property pay for itself. Construction would be in stages with expenditures based on anticipated revenues. For example, the remaining portion of 200 Riverview would not be completed until 100 Riverview had been rented close to capacity. IDS' appraiser estimated that the entire redevelopment of Riverview Center could have been completed with both buildings fully rented, except for a 5 percent vacancy rate, within six months.
The defendant City has taken exception to plaintiff's projections. The City claims that plaintiffs' estimate of demolition is too low based upon the actual expense incurred by the City in demolishing 200 Riverview. For example, it was pointed out that the City paid $202,000 for asbestos removal while plaintiffs have only estimated $70,000 for this work. This comparison, however, is not totally accurate since the City's demolition was much more extensive than that contemplated by Russo.
A more valid point raised by the City, however, is that plaintiffs' figures are based upon estimates with no firm commitments that the work be performed. The cost figures used by IDS' appraiser were for the most part based upon Marshall's Valuation Handbook. Marshall's is a valid tool universally recognized as an aid in valuing property. It is less valuable, however, in situations such as here where actual projected costs must be considered. For example, it is doubtful if a prudent general contractor would submit a bid based upon such estimates rather than obtain commitments from prospective subcontractors.
IDS' appraiser projected that, except for a 5 percent vacancy, the renovated Riverview Center would be fully rented within six months. Rental of the property would be an essential factor under Russo's concept that whereby construction and demolition would progress as office space was rented.
One of the parties showing an interest in the property was Nature Most Laboratories of New England, Inc., which agreed to purchase as a condominium basement space at 100 Riverview Center. Russo testified that the net purchase price was $250,000. The two contracts with Nature Most indicate prices of $300,000 June 1, 1996) and $340,000 (July 24, 1996). No satisfactory explanation has been given for these discrepancies. The evidence, however, CT Page 10495 indicated that Nature Most had a bank commitment dated September 13, 1996, for a loan of $285,000 given upon a representation that the purchase price was $300,000.
The City claims that condominium conversion should not be considered since IDS did not comply with General Statutes §47-220 (a) or (b) in that no declaration of condominiums or maps had been filed in the land records. In this argument, the City relies on Stratford Arms Co. v. Stratford, 7 Conn. App. 496,508 A.2d 842 (1986). The situation here, however, differs from theStratford case. Here, we are dealing with reasonable probability and where the declaration of condominiums had been prepared and could have been filed it must be concluded that Nature Most could have proceeded with the purchase at the net price of $250,000.
There was evidence also that the State of Connecticut Department of Labor, which was then located in a neighboring building, was seriously considering moving to 100 Riverview Center if satisfactory parking could be arranged. The state was also considering other locations and in December entered into a lease for space in another building.
Although there were no firm commitments, there were other prospective tenants who were actively considering renting space at Riverview Center prior to the condemnation. There were also tenants then at 100 Riverview Center who would remain.
Even though Russo and his sales people were actively marketing Riverview Center and were having some success, it must be concluded that the appraiser's projection that the property would be substantially rented within six months cannot be accepted. Claims of such probability "must be scrutinized with care and examined with caution." Budney v. Ives, supra,156 Conn. 90.
The proposed Riverview Center would be in competition with buildings located in outlying areas. It is found that the downtown area, in which Riverview Center was located, was declining with mostly older buildings. As has been noted, commercial activity had moved to the outlying malls and shopping centers. These outlying areas where newer buildings, could be constructed with ample space for parking, and better highway access which would also attract commercial lessors and be in competition with Riverview Center. CT Page 10496
No detailed market studies have been placed into evidence to support the opinions that such a demand existed for office space with parking in the downtown area or that the entire property would be rented in such a short time. However, credible evidence was entered that it took several years to rent office space to an acceptable level in the neighboring Middlesex Mutual building, a better building with dedicated parking.
As previously noted, there was no firm evidence as to what the cost of the project would be.
The overly optimistic projections with respect to rentals together with the conjectural evidence of the cost of the project lead to a conclusion that on the date of the taking, Russo's proposal was too speculative with too many variables to be found financially feasible. Budney v. Ives, supra, 156 Conn. 90. This is particularly true where there was no commitment for outside financing and the project was to be self supporting. It is reasonable to conclude that any serious glitch in either the cost or rentals could have a domino effect on the entire project.
There was evidence concerning whether or not Russo's proposed plan would be financially feasible and be maximally productive. Russo testified that it would be. Hanan Golan, a successful real estate entrepreneur, supported Russo's conclusions and expressed a desire to participate in the project. It must be concluded, however, that Golan was expressing confidence in the general concept. There was no evidence that Russo and Golan discussed specifics. This would have been impossible since no detailed plans then existed.
Strongly mitigating against a finding that Russo's plan would be financially feasible and maximally productive is the lack of confidence in the property evidenced by the option price of $500,000. The sale price of real property is an important piece of evidence in determining the value of the property. Pandolphe'sAuto Parts. Inc. v. Manchester, 181 Conn. 217, 223, 435 A.2d 24
(1980).
The evidence indicates that MRALP and the Konover interests were disillusioned with the property and wanted to be rid of it. They were unable to rent 200 Riverview and 100 Riverview had an 80 percent vacancy rate. They had difficulties with the City over parking and wished to concentrate on other projects. CT Page 10497
Even with these negative factors, the discrepancy between the option price of $500,000 and the appraisal value of $4,250,000 based upon Russo's plan is impossible to reconcile. The only conclusion which may be drawn is that the Konover interests which owned and developed property and with all of the experience and business acumen it had available felt that Riverview Center could not be made maximally productive.
It must then be concluded that plaintiffs have failed to establish, by a preponderance of the evidence, their claim for increased valuation on the basic improvements contemplated by Russo. Considering all of the evidence at the time of condemnation such plan was little more than optimistic conjecture and speculation.
 IV
The court must determine the market value of the whole tract as it existed at the time of the taking giving consideration to the highest and best use of the property. Stamford Apartments v.Stamford, supra, 203 Conn. 592. From the evidence and the court's observations of the premises and the area within which it is located, it is concluded that the highest and best use is a continuation of the mixed commercial and retail use with a concentration on providing office space.
The appraisers who testified considered the value utilizing various standard methods. Considering all of the factors involved, it must be concluded that the income approach is the most appropriate method of determining the fair market value of the property.
IDS' appraiser, using the income approach, arrived at a fair market value of $4,260,000. This valuation was based upon the proposed changes in the property which the court has determined were being too remote and speculative to have an effect on the value of the property at the time of the taking. Since the appraisal did not reflect the value of the property at the time of taking, it is of diminished assistance to the court in determining the value of the property. Levine v. Stamford, supra,174 Conn. 235.
To arrive at the value to be placed on the land, the court must weigh the opinion of the appraisers, the claims of the parties in light of the circumstances in evidence bearing on CT Page 10498 value, and the court's general knowledge of the elements going to establish value including the viewing of the property. Schnier v.Ives, 162 Conn. 171, 177-178, 293 A.2d 1 (1972). Although the court is not required to rely on either appraiser, the better evidence and the factors stated in Schnier cause the court to adopt the market value arrived at by the City's appraiser. This appraisal accurately reflects the conditions of the property, the area in which it is located and the market conditions which affect value. The income for the property is based upon a five-year cash flow projection which is reasonable and takes into consideration the correct state of the property as well as its reasonable potential.
The value arrived at by the City's appraiser is higher than the option price for which the disenchanted owner was willing to sell the property. Taking into consideration all of the factors involved in the offer to sell the option price is a valid check against the appraisal figure and supports the validity of that figure.
Based upon the above, the fair market value of the entire property before the taking is found to be $910,000.
Having determined the fair market value of the entire property, the damages to the property resulting from the condemnation must be determined. Cappiello v. Commissioner ofTransportation, supra, 203 Conn. 679. The court must determine what was actually taken and what was left.
As previously noted, the Certificate of Taking was filed on December 6, 1996, and the sum assessed by the City $260,000 was deposited. A description of the property taken was attached to the certificate. This description indicated that it included 200 Riverview Center with all appurtenant rights.
On December 29, 1997, the City filed a corrected Certificate of Taking. No additional amount of damages was deposited with the certificate. The corrected certificate contained a corrected and more accurate description of the property taken and the following paragraph:
 Reserving therefrom unto MRALP, IDS and Fleet Bank, as their interests may appear, their successors and assigns, appurtenant easements for specific purposes over, under and across the subject property of Middletown for the benefit of their respective interests in and to the CT Page 10499 remainder parcel of land with building and improvements thereon and known generally as 100 Riverview Center, Middletown, Connecticut, said easements with stated purposes being more particularly shown, described and depicted as Easements #1, #2, #3, #4, #5 and #6 on said "Easements Map" Sheets 2/3 and 3/3 Dated 5-19-97, Revised 7-9-97 and 9-21-97 which map in all other respects has been more fully described as aforesaid, original of said map being Sheets 2/3 and 3/3 thereof deemed a part hereof by virtue of Conn. Gen. Stat. § 7-31, which has been filed with the Town Clerk's Office in Middletown, to which reference may be had.
The first paragraph of the description in the corrected certificate creates no significant problem. This is merely a more accurate description of the property taken. The second paragraph above set forth, however, consists of easements conveyed back to the property owners over the property taken. Most of the easements are rights of ingress and egress.
Easements 4 and 5, however, were more significant. The pedestrian mall which ran between 100 and 200 Riverview Center and which connected Main Street with the municipal parking garage was supported along its northerly side by the foundation of 100 Riverview Center. In order to maintain support for the mall as a part of the condemnation the City took the foundation and footing for 100 Riverview Center as well as two feet of the cantilevered face of 100 Riverview Center building, which projected over the mal1.
Easement #4 included "ALL RIGHTS, EASEMENTS ACROSS LAND OF THE CITY OF MIDDLETOWN IN FAVOR OF MIDDLETOWN REALTY ASSOCIATES LIMITED PARTNERSHIP FOR THE PURPOSE OF ALLOWING THE PORTION OF THE EXISTING BUILDING TO REMAIN AS IS AND FOR THE MAINTENANCE OF THE SAME."
Easement #5 included "EASEMENT ACROSS LAND OF THE CITY OF MIDDLETOWN IN FAVOR OF MIDDLETOWN REALTY ASSOCIATES LIMITED PARTNERSHIP FOR THE PURPOSE OF ALLOWING ANY EXISTING FOUNDATION AND FOOTINGS BELOW THE EXISTING BUILDING TO REMAIN AS IS AND FOR THE MAINTENANCE OF THE SAME."
There is a question as to whether the court may consider these easements which in effect abandoned rights in the condemned property.
Only a few Connecticut courts have directly addressed this CT Page 10500 issue. In Carl Roessler Inc. v. Ives, 156 Conn. 131, 239 A.2d 538
(1968), the Court held that the state could not abandon a portion of property sought by condemnation and demand a partial refund of the condemnation award from the property owner. Id., 144-45. In that case the state took the property for the purpose of building a highway. Three years after the taking, the state filed an amended notice of taking in an attempt to return a portion of the property to the owner and seek a refund of the condemnation award. Since the state had taken physical possession of the property, demolished and removed buildings thereon, and constructed a highway on the land at the time it sought to abandon a portion of the condemned property, it could not revise the taking line. "Once a condemnor institutes proceedings, gains possession of condemned property by depositing the amount of the commissioner's award in the registry of the court, applies the property to the purpose for which it was condemned, and is no longer in a position to restore the status quo, dismissal of any or all condemnees would be improper and prejudicial." Id. 142. See also Trumbull v. Ehrsam, 148 Conn. 47, 53, 166 A.2d 844
(1961) (holding that the condemnor could abandon condemnation proceedings of property originally sought to build a high school and reasoning that, although the town had obtained an order for immediate entry and had cut down some trees, there had not been such a taking as to prevent the condemnor from abandoning the proceedings); Town of Clinton v. Waller, 16 Conn. Sup. 230, 231
(1949) (finding that the mere fact that condemnation had started and that the property owner had incurred expenses in defending her claim did not estop the condemnor from abandoning the proceedings).
Foreign jurisdictions likewise hold that a condemnor's right to abandon ceases when an actual physical taking occurs so that the condemnor is no longer in a position to restore the status quo. See Murray v. Devco Ltd, 731 S.W.2d 555, 557-58 (Tex. 1987) (finding condemnor could correct a certificate of taking two years after condemnation where status quo could be restored in that the condemnor could surrender possession of the property without prejudicing the rights of the property owner);Southwestern Bell Telephone Companv v. West, 417 S.W.2d 297,299-300 (Tex. 1967) (finding condemnor could amend condemnation to give property owners the right to construct railroad spur tracks, roads, streets or drainage structures on the surface area of the condemned property which was taken to install an underground cable and reasoning that the amended condemnation caused no injury or prejudice to the property owner); Concannon v. StateCT Page 10501Roads Commission, 188 A.2d 700, 703-04 (Md. 1963) (holding that the condemnor could not revise taking line and demand a refund of the condemnation award from the property owner where condemnor had taken physical possession of the property and completed highway improvements); Texas Power Light Company v. Cole,313 S.W.2d 524, 530 (Tex. 1958) (finding condemnor did not loose its right to abandon a portion of the condemned property where, at the time of trial, condemnor did not physically occupy the property and had not interfered with the property owner's mining operations; the court reasoned that the condemnor's revision of the taking line could take effect without injury to the property owner); State v. Superior Court, 294 P.2d 418, 420-21 (Wash. 1956) (holding that the trial court did not err in permitting condemnor to amend notice of taking to include less land than originally sought; the court stated that a condemnor may take property subject to certain easements of the landowner, so as to minimize his damages and reasoned that no greater estate of interest should be taken than reasonably necessary for public necessity or use); Petition of Huron-Clinton MetropolitanAuthority, 10 N.W.2d 920, 925 (Mich. 1943) (finding condemnor could amend its description of the property taken where the amendment did not interfere with substantial rights of the parties).
In light of the above case law and the circumstances of this case, it is appropriate for the court to consider the easements in determining damages resulting from the condemnation. If this is deemed to be inconsistent with any ruling made during the trial, such ruling is hereby modified.
In assessing damages the court must consider the fact that the portion of the property remaining after condemnation was the most productive and that portion taken had by far the least present value. The court must also consider that while the easements do reduce the damage to the remaining property, the existence of the easements, particularly #4 and #5, will have a negative effect on the market value of the remaining tract.
As a result of the condemnation, the court finds:
Value before taking $910,000
Value after taking $560,000
Damages resulting from taking $350,000
CT Page 10502
Accordingly, judgment may enter that plaintiff recover $350,000.
Joseph J. Purtill Judge Trial Referee